**In re John RIO, Jr., and Avelina M. Rio, Debtors.**

**Bankruptcy No. 85–01714.**

United States Bankruptcy Court, M.D. Alabama, S.D.

Oct. 25, 1985.

Charles T. Reese, Reese & Reese, Daleville, Ala., for debtors.

Ernest Hornsby, Johnson, Huskey, Hornsby & Etheredge, Dothan, Ala., for credit union.

## ORDER ON COMBINED PETITION TO ENFORCE AUTOMATIC STAY AND CONTEMPT AGAINST DEFENDANT

A. POPE GORDON, Bankruptcy Judge.

The debtors, John Rio, Jr. and Avelina M. Rio, filed what amounts to a motion seeking sanctions against the Army Aviation Center Federal Credit Union for willful violation of the stay imposed by 11 U.S.C. § 362(a). A trial was held in the matter October 23, 1985.

This is a core proceeding which this court may hear and determine under 28 U.S.C. § 157(b)(1). These findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, and are based on testimony and other evidence before the court and the arguments of counsel.

The debtors filed a petition under Chapter 13 of the Bankruptcy Code. The case was filed on October 7, 1985. After that the events leading to filing this motion took place rapidly.

On October 7, the debtors filed the Chapter 13 petition. Filing the petition triggered the automatic stay provided by § 362.

On October 8, the attorney for the debtors notified Ken Davis, a collection officer working for the credit union, that the Chapter 13 petition had been filed by the debtors. Davis called the attorney for the credit union and told him about the Chapter 13 petition.

On October 9, the credit union began to return checks drawn by Rio. The returned checks were marked "N.S.F.", meaning not sufficient funds.

On October 10, Davis wrote a letter to Rio notifying him that the creditor union had placed an "administrative hold" on his accounts.

On October 14, Rio, while visiting at Ft. Campbell, Kentucky, learned of the letter and the freeze on his two credit union accounts. Since filing the petition, he had written 22 checks on the checking account. He began to receive telephone calls from check holders demanding payment of the dishonored checks.

Rio is a retired warrant officer who is employed as a civilian flight instructor at Fort Rucker, Alabama. He had been a customer of the credit union for about eight years. He had arranged to have his military retirement checks deposited each month by the government directly to his credit union account in the amount of $1,018.00 per month.

At the time he filed the Chapter 13 petition, he had $1,400.14 on deposit at the credit union. He was also indebted to the credit union in the amount of about $2,064.00. The indebtedness was unsecured unless, as the credit union insists, the account was pledged to the credit union under paragraph 6 of the open end credit plan agreement executed by Rio on July 26, 1984. Defendant's Exhibit 1. Paragraph 6 of the credit plan reads—

... [U]pon default or determination by the credit union that there has been a substantial adverse effect on the ability to repay of any of the undersigned as a result of a change in status or employment or increase in outstanding obligations, the undersigned hereby pledge all shares and/or deposits and payments

and earnings thereon which I/we then or thereafter may have ... as security for any and all moneys advanced under this plan and interest accrued thereon and authorize the credit union, in the case of default, to apply same to payment of said obligation.

The indebtedness was payable in installments of $105.00 per month on the second day of each month. All payments prior to the one due October 2 had been regularly made. The indebtedness under the credit plan was not in default. Default under the plan, according to paragraph 13 of the agreement, occurs when the debtor has not made a particular payment during a calendar month and the credit union declares the entire principal balance and interest to be due and payable, which was not done. Also, there was no evidence that the credit union made a determination that there was a change in the status of the debtor which would adversely affect his ability to repay the loan, as required by paragraph 6. Both were conditions precedent for the account to become a pledge to the credit union. Thus the credit union had no consensual lien on the accounts.

The letter of October 10 to Rio reveals that the act was a willful act by the credit union after receiving notice of the Chapter 13 petition. The letter reads—

Please be advised that we have placed an administrative hold on both your Share & your share draft accounts. We will not pay or release any money from these accounts until such time as your Chapter XIII bankruptcy plan has been completed. We are acting on the advice and instructions of our attorney in so doing. As a result of these deposits, we have and will maintain a possessory security interest in the money on deposit with us. No money will be taken from these accounts unless your Chapter XIII plan is dismissed and upon completion of the payment plan, you can recover the full balances in both of these accounts.

Davis readily admitted that the letter was written and the accounts were frozen solely because the Chapter 13 case had been filed.

The Chapter 13 plan provides for paying all creditors, including the credit union, in full over a period of 36 months. The plan has not been confirmed. Payments are to be made at the rate of $1,018 per month which indicates that Rio is using his entire retirement check to pay creditors. There is evidence to show that Davis was informed that the plan provided payment of 100% to all creditors and that the credit union would continue to receive payments on the indebtedness, not from Rio, but from the Chapter 13 trustee. In any event, it is undisputed that the credit union did not look at the court file or the proposed plan before freezing the debt.

The credit union is not totally unfamiliar with Chapter 13 proceedings. The testimony showed that a number of its customers have filed Chapter 13 cases, and also, curiously enough, Rio is the only debtor whose account had ever been frozen because of a Chapter 13 filing.

Rio wrote 22 checks totaling $766.58. The credit union set off against the account $10 for each check presented even though the account was supposedly frozen, but later credited these charges back to the account, apparently after receiving a complaint.

As soon as Rio learned of the freeze and that his checks were being returned marked "N.S.F.", he warned creditors (check holders) and redeemed as many checks as he could. Nevertheless, he received notices of criminal prosecution. His check-cashing privileges at the Post Exchange, Commissary and other facilities at Fort Rucker and Fort Campbell were suspended for one year. He was forced to sell some of his property (including golf clubs and tools) and cash savings bonds to raise money to redeem the checks. In addition, some of the creditors charged him for handling the bounced checks.

He was at Fort Campbell for his daughter's wedding when the checks began to bounce and he began receiving telephone calls. He had written some of the checks

there for her wedding. He testified he incurred expense on long distance calls in an effort to remedy the situation, and that he was humiliated, embarrassed and distressed from the telephone calls received, as well as from the threats of criminal prosecution, the dishonored checks, the suspension of check-writing privileges, and the forced sale of property and cashing of savings bonds to redeem checks. While there was no testimony showing the exact amount of financial loss incurred as a result of the credit union's conduct, damages for the embarrassment, humiliation and distress suffered, sufficient to include his forced out-of-pocket expenditures, can be ascertained and awarded. The court finds that such damages amount to $750.

The conclusion is that the credit union willfully violated the provisions of 11 U.S.C. § 362 and that the debtor should recover compensatory damages, but not punitive damages. He should have the money in his credit union accounts on October 7 returned to him and have payment of his reasonable attorney's fee. The credit union should mitigate his damages by being required to notify the holders of returned checks that money to honor the checks was on deposit at the time the checks were presented.

### Conclusions of Law

■ Several preliminary issues and arguments can be dealt with swiftly. First, the credit union argues that the funds on deposit are cash collateral and are subject to the restrictions of 11 U.S.C. § 363(c)(2). Therefore, the credit union was entitled to withhold the funds absent a court order granting the debtor the right to use the funds. However, § 363(c)(2) is applicable only where the debtor has been authorized to operate a business. 11 U.S.C. § 363(c)(1). The debtor in this case is not engaged in operating a business and no authority to engage in business has been requested or granted.

■ Second, the credit union argues that it was entitled to adequate protection before releasing the funds. Adequate protec-

tion under § 363(e) is available only to an entity having a security interest in property of the estate. It is not at all clear that the credit union is secured by these accounts given the contingent nature of the pledge in the open end credit plan agreement described earlier. However, it is unnecessary to determine whether the credit union is secured or unsecured since the credit union was promised payment in full by the 100% payment Chapter 13 plan. *United States v. Reynolds,* 764 F.2d 1004 (4th Cir.1985). As noted above, the credit union made no attempt to determine the extent of payment it would receive under the plan prior to freezing the debtor's account.

■ The debtor's primary argument is that the credit union violated 11 U.S.C. § 362(a)(7). That section stays the setoff of any debt owing to the debtor that arose before the commencement of this case against any claim against the debtor. The debtors maintain that the so-called "administrative hold" placed upon the debtors checking account is in fact a setoff as contemplated by the Code. This court agrees.

The credit union argues that an administrative hold is to be distinguished from a setoff and that an administrative hold action is not stayed. The credit union relies heavily upon *In re Edgins,* 36 B.R. 480 (Bkrtcy.App.1984) as authority. That case was decided by a two-to-one split of opinion of the Bankruptcy Appellate Panel of the Ninth Circuit. The panel determined that a creditor bank did not violate the automatic stay of the setoff provisions of § 362(a)(7) where the bank merely froze the debtor's checking account and did not remove funds from that account.

It is the opinion of this court that *Edgins* can be factually distinguished from the case at bar. To the extent that it cannot be distinguished, this court declines to follow the majority opinion and instead adopts the opinion of the dissenting judge.

The dissent in that case reasoned that under § 542(b) an entity is required to turn

over property of the debtor except to the extent it is subject to being offset under § 553. The setoff in § 553 is clearly subject to the automatic stay of § 362(a)(7). The act of freezing an account is tantamount to a setoff and is also stayed by § 362(a)(7). The proper remedy of the bank was to seek relief from stay.

We are convinced that the philosophy of the dissent better achieves the goal set by Congress in Chapter 13, which is to adjust the debtor-creditor relationship in case of an individual with regular income in a fair and orderly manner and to rehabilitate the individual debtor.

In *Edgins*, the bank simply froze the debtor's checking account and permitted no withdrawals. In the case at bar, the credit union froze the checking account and denied the *debtor* the right to withdraw funds. However, when checks drawn by the debtor on his account were dishonored by the credit union as the result of the unilateral action of the credit union in freezing the account, the credit union immediately began to withdraw and set off the returned check charges it assessed against the debtor by removing the amount of those charges from the debtor's account. Clearly the credit union contemplated that the account would be considered frozen from the debtor's perspective. However, the credit union reserved the right to enter the account for its own purposes.

This court holds that this activity of the credit union is a setoff and a clear, willful and flagrant violation of § 362(a)(7). The fact that the credit union later restored the funds it had setoff from the debtor's account following a complaint from the debtor is immaterial. The Code does not contemplate that a creditor may violate the stay provisions until the debtor complains. The stay is automatic and immediate and any willful violation, even if later made good, is subject to the sanctions found in § 362(h).

Next, the panel in *Edgins* found that any funds held by the bank in that case were cash collateral. Under § 363(c) and § 1304(b), a Chapter 13 debtor engaged in the operation of a business must seek court approval to use cash collateral. The debtor in *Edgins* had not made such a request and therefore, was not entitled to the funds at the time the bank froze the account. Under this analysis, the *Edgins* court consideration of the issue of § 362(a)(7) was unnecessary. In the case at bar, § 363(c) was not applicable as noted earlier because Rio was not engaged in business.

Finally, the panel in *Edgins* noted in their concluding remarks that "[t]he bank's action to maintain the status quo was a proper and responsible action necessary to create a balance pending prompt action, presumably by the debtor ... to resolve the rights of the parties to the funds." This court has two reasons for refusing to apply this conclusion to the case at bar.

First, § 362 clearly sets out how the rights of the debtor and his creditors are to be "balanced" at the time a petition is filed. Except for clearly defined exceptions, creditors are stayed from any act "to obtain possession ... or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Setoff is specifically stayed under § 362(a)(7). Further, the administrative hold is clearly an act to exercise control over property of the estate. This is especially clear in the present case when the credit union actually commenced setoff of the dishonored check charges. This court declines to shift the balance between debtor and creditor established by Congress as found in § 362. Second, the *Edgins* conclusion puts the initial burden on the debtor to seek relief from the credit union's freeze. While that may be appropriate in a case in which the funds constitute cash collateral, it is clearly contrary to the intent of § 362 where the funds are not cash collateral. The burden is on the credit union to ask for relief from stay.

The debtors offer *United States v. Reynolds*, supra, as their primary authority. This is a Fourth Circuit case which cites and relies upon a Third Circuit case. Both circuit cases are clear, well-reasoned and support the goals of the Bankruptcy Code. In *Reynolds*, the Internal Revenue Service

froze an income tax refund owed the debtors. The Fourth Circuit found such an attempt "to preserve the status quo until the automatic stay expired by conclusion of the bankruptcy proceeding or otherwise" to be a violation of the automatic stay. The letter of the credit union set out earlier showed the clear intent of the credit union was to hold the funds in this debtor's accounts hostage until the conclusion of the Chapter 13 proceedings.

The pertinent language of the Third Circuit opinion is clear and unambiguous:

This Court has already prohibited banks from setting off debts against a corporate account during the pendency of a reorganization proceeding, unless those banks first request and receive relief from the automatic stay in a bankruptcy court. *In Re Penn Central Transportation Co.*, 453 F.2d 520 (3d Cir.1972). Without the automatic stay of setoff rights during reorganization, the Court reasoned, the loss of bank accounts and of accounts receivable would probably prove fatal to many otherwise viable businesses. If a bank could freeze the debtor's accounts upon the filing of a petition in bankruptcy, the debtor's chances for successful rehabilitation would be substantially diminished.

The same reasoning applies *mutatis mutandis* to proceedings under Chapter 13 of the Code, which is designed to encourage and make possible the payment, rather than the discharge of debts. The automatic stay protects debtors from their creditors and creditors from themselves while a repayment plan is developed. If a creditor could circumvent the automatic stay simply by delaying the entry of a setoff or credit in its books, it could hold the funds until the case was closed and then deposit them into its own bank account. By the unilateral action of one creditor, these funds would become unavailable for distribution to other creditors or for use by the debtor in a Chapter 13 plan, thus making it that much less likely that the debtor could be rehabilitated.

*United States v. Norton*, 717 F.2d 767, 773 (3d Cir.1983).

This court finds the above reasoning directly applicable to the case at bar. The scope of the automatic stay is broad. Exceptions to the stay should be narrowly construed. This is especially true where an asserted exception could result in the unilateral financial dismemberment of debtor and the denial of a fair opportunity for rehabilitation. Such a result is clearly contrary to the intent of the Bankruptcy Code.

The credit union sought legal advice before freezing the account. Ordinarily, that would not be an excuse not to award punitive damages. But here it is obvious that the advice was sought in good faith and given expertly and competently by the attorney for the credit union. The October 10 letter lifts some of the language from the majority opinion in the *Edgins* case (supra) when it refers to placing an "administrative hold" on the accounts and the *Edgins* case uses the synonymous term "administrative freeze". The credit union apparently attempted to use the case as a guide in good faith. Unfortunately for the credit union, the majority opinion does not reflect the philosophy of this court. However, because of the split of authority as shown by the *Edgins* case and *United States v. Reynolds*, punitive damages are not appropriate in this case.

An order reflecting the above conclusions will be entered contemporaneously herewith. The order and this opinion memorialize the verbal order and opinion from the bench on October 23, 1985.