**In re NEW YORK CITY SHOES, INC., Debtor.**

**Bankruptcy No. 87–03426S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 5, 1987.

Edward C. Toole, Jr., Mary F. Walrath, Katherine McAlice, Philadelphia, Pa., for Debtor.

Dinah Bogart Engel, Asst. Counsel, Bala Cynwyd, Pa., for Germantown Savings Bank.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The Motions brought before us by Germantown Savings Bank (hereinafter referred to as "the Bank"), in the instant relatively large Chapter 11 bankruptcy case involving a chain of retail women's shoe stores cause us to consider the rather complex interplay among various sections of the Bankruptcy Code on the attempt of a bank to "administratively freeze" funds de-

posited with it against delinquent loan balances owed to the Bank by the Debtor. We hold, consistent with *Cusanno v. Fidelity Bank,* 29 B.R. 810 (E.D.Pa.1983), *aff'g sub nom. In re Cusanno,* 17 B.R. 879 (Bankr.E.D.Pa.1982), that such an "administrative freeze," at least under controlling Pennsylvania law, constitutes a setoff. Hence, considering only 11 U.S.C. § 362(a)(7), we would not believe that such a freeze can be legally effected in light of the presence of the automatic stay.

However, we further hold that a bank's apparent right to set off the funds in a debtor's bank account renders its claim secured or at least quasi-secured as to the amount of funds deposited by the debtor pre-petition. Hence, in a Chapter 11 case, or any other case where a debtor is authorized to operate a business, we find that 11 U.S.C. § 363(c) comes into play, and the debtor may remove pre-petition deposits from a bank account only upon the condition that it provides adequate protection to the bank's interest in the pre-petition deposit pursuant to 11 U.S.C. § 363(e). Therefore, we conclude that the "administrative freeze" imposed by the Bank here was a permissible means of protecting its cash collateral, but in the amount of the pre-petition deposits only. We shall consequently order the Bank to release the Debtor's post-petition deposits, allow the Debtor to seek damages against the Bank for holding these funds, and deny the Bank's request for relief from the stay to set off the pre-petition funds deposited merely to give the Debtor a chance to provide adequate protection to the Bank's interest in the pre-petition deposits.

On July 7, 1987, the Debtor filed the instant bankruptcy case. The first of the two Motions before us, a Motion for Relief from the Automatic Stay (hereinafter "the Stay Motion"), was filed by the Bank on July 24, 1987. The Debtor opposed the Stay Motion in an Answer filed August 12, 1987. On August 19, 1987, the Bank filed the second of the Motions before us, a Motion to Prevent Debtor from Using Cash Collateral Without Complying with 11 U.S.C. § 363(c)(2) (hereinafter "the Cash Collateral Motion"). We allowed expedited consideration of the Cash Collateral Motion in order that it could be heard together with the Stay Motion on August 27, 1987. The Debtor answered the Cash Collateral Motion on August 25, 1987, and the hearing on the two Motions was ultimately continued to September 3, 1987.

On September 3, 1987, the parties presented a rather comprehensive Stipulation of Facts to us, incorporating a Deposition of Beth K. Greenberg, the Bank's commercial services supervisor. On September 3, 1987, the Bank adduced brief additional testimony from Margaret Conway, a Vice-President in charge of the Bank's department which places "holds" on depositors' accounts.

The facts are basically undisputed. On June 1, 1987, the Debtor restructured an installment loan arrangement of July, 1986, with the Bank by executing a note in its favor in the amount of $86,377.50, payable in sixteen monthly installments of $5,000.00 and a final installment of $6,377.50. The Debtor made only one $5,000.00 payment prior to its bankruptcy filing on July 7, 1987.

On the date of the bankruptcy filing, the Debtor had $4,404.90 deposited in seven separate accounts with the Bank. Additional post-petition deposits brought the total balance of the seven accounts to $9,429.38.

Since February, 1987, the Bank had imposed a "do not pay hold" on the Debtor's accounts, due to a number of the checks having been returned for insufficient funds. On July 10, 1987, the Debtor requested that the Bank continue the "do not pay hold" because one of its former officers, Terry Rakoff, was believed to be attempting to cash unauthorized checks drawn on the accounts. However, upon learning about the bankruptcy filing from newspaper accounts, the Bank placed its own "administrative freeze" on the accounts on or about July 14, 1987.

One aspect of the Bank's defense was attempting to convince us that, since there was already a "do not pay hold" on the accounts prior to the imposition of the "ad-

ministrative freeze," the latter was basically cumulative and hence relatively insignificant. The Bank failed in this endeavor. It is apparent to us that the February, 1987, "do not pay hold" merely required a check with supervisors to be sure that the account contained adequate funds before a payment was made, and that the July 10, 1987, "do not pay hold" merely required a check with supervisors to be sure that unauthorized checks were not being presented. These "holds" would apparently be released as soon as the Debtor established that an authorized check was being presented against a legitimate account balance.

However, the "administrative freeze" required consultation with the Bank's counsel before any funds would be released, as evidenced by the refusal of the Bank to release funds to undisputably authorized agents of the Debtor on August 3, 1987, and August 18, 1987, despite remonstrances from the Debtor's counsel as early as July 20, 1987. Thus, the "administrative freeze" was an unconditional and unilateral assertion by the Bank that it would retain all funds on deposit until it saw fit to do otherwise.

Few areas of the law involve as many apparent conflicts of applicable Code provisions and hence as clear a split of authorities as the area of bank setoffs. As is indicated in the first paragraph of this Opinion, our district court, affirming a decision of this Court, has rendered one of the best known holdings in this area nationally in the *Cusanno* decisions. There, our district court held, in the context of a Chapter 13 consumer case, that an "administrative freeze" of a debtor's bank account to offset a loan owed to the bank by the debtor was a setoff, and its imposition violated 11 U.S.C. §§ 362(a)(3) and (a)(7).[1] Holding that the bank account was not cash collateral, which undoubtedly was correct in that

case because 11 U.S.C. § 363(c)(2) restricts a debtor's use of cash collateral only "[i]f the business of the debtor is authorized to be operated," the district court speaks in perhaps overly-broad terms in stating as follows:

> Even if the bank had possessed a right of setoff against the Cusannos, the bank forfeited this right by failing to seek timely relief in the Bankruptcy Court. The bank's conduct would have been in error in either a Chapter 7, a Chapter 11, or a Chapter 13 case. Here, however, in a Chapter 13 case involving individual debtors of modest means who may require the bank account funds to meet daily expenses for food, clothing and shelter, the bank's actions in disregard of court authority are especially troublesome. 29 B.R. at 813.

We have only had one occasion to address the issue of bank setoffs, and we did so by way of dictum. In emphasizing our view that the concept of set off should be "applied restrictively in bankruptcy proceedings," we stated, in *In re Lessig Construction, Inc.*, 67 B.R. 436, 441 (Bankr.E.D.Pa.1986), that, in *Cusanno*, "this court properly severely limited the right of a bank to set off a deposit of a debtor-customer against a debt owed by the customer to the bank."

The view that a bank's "administrative freeze" of a debtor-customer's account is a setoff subject to at least 11 U.S.C. § 362(a)(7) has been adopted by numerous other courts. *See In re Wildcat Construction Co.*, 57 B.R. 981, 984–85 (Bankr.D.Vt. 1986); *In re Rio*, 55 B.R. 814, 817–18 (Bankr.M.D.Ala.1985); *In re LHG Resources, Inc.*, 34 B.R. 202, 203–04 (Bankr. W.D.Tex.1983); *In re Executive Associates, Inc.*, 24 B.R. 171, 172–73 (Bankr.S.D.

---

**1.** (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

. . . . .

(3) any act to obtain possession of property of the estate or of property from the estate, or to exercise control over property of the estate;

. . . . .

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; ...

Tex.1982); and *In re Nelson,* 6 B.R. 248, 250, 251 (Bankr.D.Kan.1980).

However, the *Cusanno* decision has also been the specific target of criticism in two articles co-authored by two of the giants of bankruptcy, Benjamin Weintraub and Professor Alan N. Resnick in *Freezing as Preservative—The Debtor's Bank Account,* 101 BANKING L.J. 3 (1983); and *Freezing the Debtor's Account: A Banker's Dilemma Under the Bankruptcy Code,* 100 BANKING L.J. 316 (1982).

The "dilemma," which is itself never defined in these articles, arises, as we see it, from the fact that, on one hand, the holding that an "administrative freeze" places the bank in jeopardy of acting in contempt of the automatic stay if it does not allow withdrawals from the debtor's accounts and, on the other hand, if it does allow withdrawals, subjecting it to the following adverse consequences: (1) If it has actual notice or knowledge of the bankruptcy, and pays on withdrawals, it may be liable for improperly transferring property of the estate. *See* 11 U.S.C. § 542(c), codifying the result in *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966); (2) It will lose the "banker's lien" which otherwise arises in its favor to give it a priority right to the deposited funds only so long as it retains them in its possession. *See Lowden v. Iowa–Des Moines Nat'l Bank & Trust Co.,* 10 F.Supp. 430, 433 (S.D.Iowa 1935), *aff'd,* 84 F.2d 856 (8th Cir.), *cert. denied,* 299 U.S. 584, 57 S.Ct. 109, 81 L.Ed. 430 (1936).

A substantial body of caselaw rejects the reasoning of *Cusanno* and the cases consistent with it cited at pages 428–29, *supra.* These cases include *In re Stann,*

39 B.R. 246, 248–49 (D.Kan.1984); *Kenney's Franchise Corp. v. Central Fidelity Bank,* 22 B.R. 747 (W.D.Va.1982), *rev'g sub nom. In re Kenney's Franchise Corp.,* 12 B.R. 390 (Bankr.W.D.Va.1981); *In re Edgins,* 36 B.R. 480, 483–84 (9th Cir.Bankr. App.1984); *In re Williams,* 61 B.R. 567, 570–76 (Bankr.N.D.Tex.1986); *In re Hoffman,* 51 B.R. 42, 45–47 (Bankr.W.D.Ark. 1985); *In re Gazelle, Inc.,* 17 B.R. 617, 620 (Bankr.W.D.Wis.1982); and *In re Carpenter,* 14 B.R. 405, 407–08 (Bankr.M.D.Tenn. 1981).

Collier acknowledges this split of authority and concludes, contrary to *Cusanno,* that "[t]he freeze should not be considered a violation of the stay." 4 COLLIER ON BANKRUPTCY, ¶ 553.15, at 553–72 (15th ed. 1987). Collier articulates three arguments raised by courts adopting the view contrary to *Cusanno,* i.e., that an "administrative freeze" is not a setoff: (1) A "freeze" does not contain the latter two of the three elements of a setoff articulated in *Baker v. National City Bank of Cleveland,* 511 F.2d 1016, 1018 (6th Cir.1975), i.e.: (a) a decision to set off; (b) an overt act; and (c) a record indicating a setoff on the bank's books. Since it is not a setoff, Collier reasons, the freeze is not subject to § 362(a)(7); (2) There is a passage contained in 11 U.S.C. § 542(b)[2] providing that funds subject to setoff need not be turned over to the trustee or debtor-in-possession. If the funds need not be turned over, Collier states, there would be no reason why the bank could not "freeze" them; and (3) The use of cash collateral is restricted by 11 U.S.C. § 363(c).[3] Collier's point is that, if the Debtor cannot use the deposit because they are cash collateral, there is no

---

**2.** (b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, *except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.* (emphasis added).

**3.** (c)(1) If the business of the debtor is authorized to be operated under section 731, 1108, 1304, 1203 or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of

property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

reason why the bank cannot freeze them. Collier states that *Cusanno* and cases like it "respond only to the first of the above three arguments," *id.* at 553–72, presumably implying that no answer can be made to the last two arguments.

The Bank here attempts to bolster the second and third arguments by quotes from the House of Representatives Report published at the time of the enactment of the Bankruptcy Code, suggesting that, whether a creditor is determined to be secured or unsecured determines whether that creditor is entitled to payment of a larger percentage of his claims than unsecured creditors. H.R.REP. No. 95–595, 95th Cong., 1st Sess. 184 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6144–6145. After pointing out that a bank does not have possession of the account deposit, as it is an intangible, and that bank deposits are exempted from subjection to security interests by 9–104($l$) of the Uniform Commercial Code, the Report concludes that the bank's interest is nevertheless "adequate to justify giving" it, as an "offsetting creditor the same protection as the bill gives to secured creditors." *Id.* at 186, U.S.Code Cong. & Admin.News 1978, at p. 6146.

However, the Report contains other statements which must be considerably less comforting to the Bank. The "detrimental efforts on the attempted reorganization" in allowing any setoff are noted. *Id.* at 183, U.S.Code Cong. & Admin.News 1978, at p. 6144. Further, the consequences of assertion of a right of setoff of a bank as opposed to that of trade creditors is recognized to be "potentially more disastrous," because the debtor may need the deposited funds for its working capital. *Id.* at 184, U.S.Code Cong. & Admin.News 1978, at 6145. Thus, the legislative history notes the severe adverse consequences of being too liberal in allowing a bank a right to setoff.

Another of the critiques of the *Cusanno* decision, P. Groschadl, *"Freezing: the Debtor's Bank Account: A Violation of the Automatic Stay?,* 57 AM.BANKR.L.J. 75, 76–77 (1983), points out one unique

aspect of Pennsylvania law which may impact on the setoff/freeze issue. In *Pittsburgh Nat'l Bank v. United States,* 657 F.2d 36, 38–39 (3d Cir.1981), our Court of Appeals, following such decisions as *Aarons v. Public Service Bldg. & Loan Ass'n,* 318 Pa. 113, 178 A. 141 (1935), expressly declines to follow *Baker, supra,* and holds that an "automatic setoff can be 'exercised' or 'actually made' at the moment of the depositor's default." *Id.* at 39. Thus, no "overt act" nor entry on the bank's books is held necessary to effect a bank setoff in Pennsylvania. While this result generally enhances a bank's rights, it also undermines, probably conclusively, the first argument which Collier notes is advanced by courts adopting the view that an "administrative freeze" is not a setoff. See page 429 *supra.*

As our *Lessig* Opinion indicates, we are not overwhelmed by the second point Collier states is raised by courts that held that a "freeze" is not a setoff, see page 429 *supra,* i.e., the argument that § 542(b) allows a bank to retain the deposit. We recognize that the *Pittsburgh Nat'l Bank* holding enhances the status of a bank's rights to setoff. However, even if this is so, we indicated that our interpretation of § 542(b) in *Lessig,* 67 B.R. at 444, was as follows:

> We do note that "[a]n allowed claim ... that is subject to setoff under section 553 of this title, is a secured claim" to the extent of the setoff. 11 U.S.C. § 506(a). We also note that 11 U.S.C. § 542(b) provides that an exception to the requirement that funds in the possession of a non-custodian need be turned over to the trustee or debtor-in-possession exists in the case of a "debt ... under section 553 of this title against a claim against a debtor." However, we agree with the holding of Judge King in *In re Harris,* 19 B.R. 624, 626 (Bankr.E.D.Pa.1982), that § 542(b) "does not state that the court may not, under certain circumstances, order a turnover of a debt subject to setoff under § 553." Given our inclination against granting any dispensations to the general bankruptcy concept barring preferential treatment to

any creditors unless expressly sanctions by the Code, we would not be inclined to grant relief from automatic stays and permit parties asserting claims of setoff to obtain exemption from turning over amounts owed to debtors freely.

We reaffirm that reasoning. Contrary reasoning would prohibit a depositor-debtor from ever obtaining any turnover of funds from a bank, and this result would appear contrary to the letter of the decisions of the Court of Appeals and the district court in *In re Penn Central Transportation Co.*, 453 F.2d 520, 523 (3d Cir.1972), *aff'g*, 315 F.Supp. 1281, 1283–85 (E.D.Pa.1970); and 458 F.Supp. 1234, 1328–30 (E.D.Pa.1978) (Bank setoffs not permitted because they would "frustrate the reorganization process"); and the spirit of the Court of Appeals' decision in *United States v. Norton*, 717 F.2d 767, 772–73 (3d Cir.1983) (Internal Revenue Service not entitled to set off income tax delinquencies which are paid in the debtor's Plan). *Norton*, in our view, successfully moreover, harmonizes *Pittsburgh Nat'l Bank* and the *Penn Central* decisions. Banks may have certain rights, but they cannot frustrate the reorganization process in asserting them.

We also fail to see how the "banker's dilemma" is so difficult to resolve. The Bank can protect itself from the consequences of *Marin* by placing something akin to a "do not pay hold" on a debtor's accounts. If withdrawals were cleared with the debtor, the bank could then pay them and protect itself from liability. As we indicated at pages 427–28, *supra*, we see significant distinctions between the "do not pay hold," which the Debtor could loosen at will, and the deep "administrative freeze" imposed by the Bank here upon its becoming aware of the Debtor's bankruptcy filing.

Secondly, we see no grave adverse public policy consequences in diminishing the impact of the "banker's lien." Allowing a bank to effect a setoff without any prior judicial determination of the legitimacy of its claims raises, in any event, questions about fundamental fairness and due process of law. *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Co.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Parks v. "Mr. Ford"*, 556 F.2d 132 (3d Cir.1977) (en banc); and *In re Souders*, 75 B.R. 427 (Bankr.E.D.Pa.1987). *But see* B. Clark & J. Landers, *Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution*, 59 VA.L.REV. 355, 400–02 (1973); and S. Stillwater, *The California Banker's Lien Law: A Reappraisal of a Creditor's Remedy in a New Economic Context*, 27 BUS.LAW. 777 (1972).

However, we believe that there is no logical way that the Debtor here can avoid the impact of the third argument recited by Collier supporting the conclusions that an "administrative freeze" is not impermissible, at page 429 *supra*, i.e., that use of the funds deposited with the bank would constitute an unauthorized use of cash collateral in violation of § 363(c). The force of this argument is also enhanced by the *Pittsburgh Nat'l Bank* holding. If the Bank here is indeed a secured or a quasi-secured creditor, the Debtor clearly has the burden of showing that the Bank is adequately protected before the Debtor may use the Bank's cash collateral. *See* 11 U.S.C. §§ 363(c)(2), (e), (o); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 384–85 (Bankr.E.D.Pa.1987), *aff'd*, 75 B.R. 819, 821–22 (E.D.Pa.1987); and *In re Lee*, 40 B.R. 123, 126 (Bankr.E.D. Mich.1984).

We note that *Cusanno* and several of the other cases which follow it involved consumer-debtors, and therefore § 363(c) was not a factor in those cases, *e.g., Rio, supra*, and *Nelson, supra*. The Chapter 11 cases which follow *Cusanno* deal with the § 363(c) issue holding that a "freeze" is excessive in light of the fact that the Bank has not established its right to setoff, *Wildcat Construction*, 57 B.R. at 985, and that hence the Bank should be obliged to prove that the Debtor is in fact using cash collateral and obtain an injunction before imposing a "freeze," *Executive Associates*,

*supra,* 24 B.R. at 173.[4] We share the concern of these Courts that a bank should not be accorded a free rein in freezing whatever it deems appropriate, without any court approval, which might be both excessive from a technically legal standpoint and disastrous to a debtor's reorganization from a practical standpoint. However, here, the Bank has, unlike its counterpart in *Cusanno, Wildcat Construction,* filed a Motion seeking to enjoin the Debtor from using cash collateral, which is also before us.

■ We therefore conclude as follows: The *Cusanno* holding that an "administrative freeze" constitutes a setoff is correct, given the status of Pennsylvania law regarding bank setoffs. Hence, a bank must obtain relief from the automatic stay pursuant to 11 U.S.C. § 362(a)(7) to consummate a setoff or to proceed to "administratively freeze" all funds except those pertinent to which it has a security or a quasi-security interest which would present a business debtor from utilizing cash collateral. Thus, in a consumer case, a bank would violate the automatic stay by so much as effecting an "administrative freeze" on a debtor's bank account to attempt to offset a liability of the bank. However, in a business case, the prohibition upon use of cash collateral would authorize an "administrative freeze," although not a consummation of the setoff, to the extent that a setoff would be permitted under 11 U.S.C. § 553(a).[5] In these circumstances, the freeze could be lifted only upon a showing by the Debtor that the bank would be adequately protected, as required by 11 U.S.C. §§ 363(c)(2), (e), and (o). This result is consistent with *Norton, supra,* wherein the Court of Appeals denied the Internal Revenue Service's attempt to utilize setoff in a circumstance where its priority claims were adequately

protected under the terms of a confirmed Plan. 717 F.2d at 773–74. Also, if the Bank freezes funds to which no right of setoff attaches, it acts at its peril, and may be liable for damages for violation of 11 U.S.C. § 362(a)(7).

■ We shall now apply these holdings to the instant factual setting. Since the Debtor clearly is a business, 11 U.S.C. § 363(c) comes into play and permits the Bank to "freeze" the account until it is provided with adequate protection as to the amount of funds to which the Bank arguably had a valid right of setoff per § 553(a) and hence to which they had a quasi-security interest as described in the House Report, cited at page 430 *supra.*

However, we do note several particulars. First, according to the Stipulation of Facts, the Debtor only had $4,404.90 on deposit with the Bank as of the time of the filing of the petition by the Debtor. The sum of $5,024.48 was deposited by the Debtor post-petition. The $5,024.48 sum is therefore a post-petition debt of the Bank to the Debtor and therefore is not subject to setoff under § 553(a). *See Cooper-Jarrette Inc. v. Central Transport, Inc.,* 726 F.2d 93, 96 (3d Cir.1984); and *Lessig, supra,* 67 B.R. at 441–43. Hence, the Debtor is obliged to provide adequate protection as to only the sum of $4,404.90. Since, the Bank had no right to hold the $5,024.48 balance, and we will direct it to release this sum immediately. Furthermore, the Debtor may seek recourse against the Bank pursuant to 11 U.S.C. § 362(h) and for civil contempt for its improperly "freezing" the $5,024.48 balance of this fund. *See In re Wagner,* 74 B.R. 898, 902–06 (Bankr.E.D. Pa.1987). We will allow it to do so within ten days and schedule a hearing within thirty days on any such Motion. We note that the Bank here has brought this result

---

4. These concerns echo those which we expressed at page 431 *supra,* concerning fairness and due process considerations involved in unilateral action by banks to impose what *they* consider to be their rights of setoff.

5. Sec. 553. Setoff.

 (a) Except as otherwise provided in this section and in section 362 and 363 of this title,

this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

upon itself by unilaterally freezing more funds than it was entitled to do, which is the calculated risk of such actions prior to court authorization.

We also observe that the burden of the Debtor to establish adequacy of its protection of the Bank's interests in the $4,404.90 properly "frozen" might be diminished in relation to that imposed upon a debtor attempting to utilize the cash collateral of a classic, heavily-secured creditor. *Compare In re Cann & Saul Steel Co.,* 76 B.R. 479, 488 (Bankr.E.D.Pa.1987); and *Grant Broadcasting, supra,* 71 B.R. at 389–90. As the *Penn Central* cases and the House Report excerpts cited at page 430 *supra* indicate, the existence of a "banker's lien" cannot be permitted to "frustrate the reorganization process." 315 F.Supp. at 1283, *aff'd,* 453 F.2d at 523, even if it is imposed in a totally legal manner.

Here, it is doubtful that the Debtor's providing adequate security for a very modest sum regarding which a valid setoff exists, i.e., $4,404.90, will frustrate this large debtor's reorganization. At the hearing on September 3, 1987, the Debtor's counsel indicated a willingness to provide for adequate protection of the Bank's cash collateral in its Plan in the event that this Court failed to sustain its defenses completely. Since we do not know precisely what the Debtor has in mind in this regard, we will allow it ten days to spell this out more clearly and, again, schedule a hearing to resolve this issue in about thirty days.

We would of course hope that, guided by this Opinion, the parties will be able to amicably resolve this issue and the § 362(h)/contempt issue without the actual necessity for the hearing scheduled.

An Order consistent with the foregoing shall issue.

### ORDER

AND NOW, this 5th day of October, 1987, after testimony and argument on the Motions of Germantown Savings Bank (hereinafter referred to as "GSB") (1) for Relief from the Automatic Stay (hereinafter referred to as "the Stay Motion"), and (2) to Prevent the Debtor from Using Cash Collateral, without Complying with 11 U.S.C. § 363(c)(2) (hereinafter referred to as "the Cash Collateral Motion"), on September 3, 1987, it is hereby ORDERED as follows:

1. The Stay Motion is DENIED, without prejudice to GSB to reiterate same if it is determined that adequate protection for $4,404.90 in the Debtor's accounts is not provided to GSB by the Debtor as a result of the hearing scheduled in paragraph four *infra.*

2. The Cash Collateral Motion is GRANTED in part. GSB shall allow the Debtor to withdraw the $5,024.48 in post-petition deposits in its accounts immediately but may hold the $4,404.90 in pre-petition deposits pending disposition of any proposal by the Debtor to provide it adequate protection.

3. The Debtor shall be permitted to provide a statement of how it proposes to adequately protect the Bank's interest in the sum of $4,404.90 held by it; and to file a Motion pursuant to 11 U.S.C. § 362(h) or for civil contempt against the Bank on or before October 17, 1987.

4. A hearing on the filings of the Debtor pursuant to paragraph three *supra* shall be scheduled on

THURSDAY, NOVEMBER 5, 1987, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

5. The original copy of any filings pursuant to paragraph three *supra* shall be filed with the Clerk of this Court on or before 4:30 P.M. on October 17, 1987, at the following address:

The Honorable David A. Scholl
United States Bankruptcy Judge
3722 United States Court House
601 Market Street
Philadelphia, PA 19106–1763