**In re George W. BRIGGS, Debtor.**

**Bankruptcy No. 91–20668.**

United States Bankruptcy Court,
E.D. Michigan, S.D.
at Flint.

July 29, 1992.

Peter L. Bagley, Flint, Mich., for debtor.

W. Schuyler Seymour, Jr., Flint, Mich., for Security Federal Credit Union.

## MEMORANDUM OPINION ON DEBTOR'S MOTION FOR SANCTIONS AND INJUNCTION

ARTHUR J. SPECTOR, Bankruptcy Judge.

### FACTS AND PROCEDURAL HISTORY

This matter involves no disputed issues of fact. On May 18, 1988, Security Federal Credit Union (the "Credit Union") loaned George W. Briggs (the "Debtor") $8,000. The debt was secured by the Debtor's 1984 Mansion mobile home, as well as a share account maintained by the Debtor at the Credit Union. Pursuant to an automatic payroll deduction arrangement, $125 of the Debtor's wages was paid weekly into his Credit Union account by the Debtor's employer, General Motors Corp. The Credit Union then applied that sum to the mobile home indebtedness and to any amounts owed by the Debtor on an unsecured line of credit.

On May 15, 1991, the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. As of that date, the outstanding balance on the mobile home debt was $4,432.17, the mobile home was worth $5,000, and the balance in the Debtor's account was $5.00. When the case was commenced, the Debtor also owed the Credit Union $4,595.00 on the unsecured line of credit.

On May 22, 1991, the Credit Union sent the Debtor two letters, Debtor's Exhibits 1 and 2. Noting that the Debtor's bankruptcy "plac[ed] the Credit Union at risk for your unpaid loan balance," Exhibit 1 advised that the Credit Union would discontinue the Debtor's member services. Both letters stated that the Credit Union had frozen the funds in the Debtor's account. Exhibit 1 explained that the funds would remain frozen "pending entry by the Bankruptcy Court of an Order with respect to said account[ ]." Exhibit 2 informed the Debtor that "[t]hese shares are unavailable unless you reaffirm your loan and the reaffirmation becomes valid. If you are granted a discharge without reaffirming, the shares will be applied to your loan balance." Exhibit 2 also stated:

> The Credit Union does not have the power to stop your payroll deductions. If you do not intend to honor your obligations to the Credit Union, you must file a Payroll Deduction Cancellation form. This form may be obtained from the Credit Union. If you do not terminate the payroll deductions, the Credit Union will assume that you intend to continue with the payroll deductions on the same terms as were in effect on the day before the bankruptcy petition was filed.

On May 30, the Credit Union's head delinquent loan officer, Sharon Hogan, advised the office of the Debtor's attorney, Peter L. Bagley, that the Debtor would have to reaffirm both debts or else he could not reaffirm either debt. Thereafter, Ms. Hogan sent a separate reaffirmation agreement for each debt to Mr. Bagley. Creditor's Exhibits B and C. The reaffirmation agreements had already been filled out and signed by Ms. Hogan on behalf of the Credit Union. Each contained a "Declaration of Attorney for Debtor(s)" which, tracking § 524(c)(3),[1] stated that the agreement "represents a fully informed and voluntary agreement by the Debtor(s) and ... does not impose an undue hardship on the Debtor(s) or a dependent of the Debtor(s)."

---

1. Unless otherwise noted, all statutory references are to the Bankruptcy Code.

Even though Mr. Bagley advised him not to reaffirm the line-of-credit debt, the Debtor signed both reaffirmation agreements on June 4, 1991, because he was afraid he would lose his home and membership privileges if he did not. Mr. Bagley signed the declaration contained in the reaffirmation agreement pertaining to the mobile home (Exhibit C), and returned both agreements to Ms. Hogan. Ms. Hogan noticed that Mr. Bagley had not signed one of them, and wrote to him on June 18, 1991, about it. He responded with a letter dated June 19, 1991 (Creditor's Exhibit D), stating that his refusal to sign the declaration "has no affect [sic] on the validity of the reaffirmation or on your ability to file the reaffirmations with the court." The letter directed Ms. Hogan to file the reaffirmation agreements with the Court. After consulting with the Credit Union's attorney, however, Ms. Hogan refused to file either of the executed agreements.

On June 26, 1991, the Debtor went to the Credit Union to transfer funds from his share account to his mobile home loan account. An employee of the Credit Union informed him that the payment was unnecessary because the Credit Union would be repossessing the mobile home shortly. The Credit Union nevertheless allowed the Debtor to make a $750 withdrawal and to apply $375 of that sum to the mobile home loan account. The Debtor also executed a Cancellation of Payroll Deduction at that time. Creditor's Exhibit F.

■ The Credit Union subsequently filed a motion on July 8, 1991, for abandonment of the mobile home pursuant to § 554, and for relief from the automatic stay pursuant to § 362(d)(2).[2] The Debtor objected. At a hearing conducted on July 24, 1991, I noted that the Final Report of Trustee in No-Asset Case was filed on June 18, 1991, from which I inferred that the trustee made a determination that the mobile home was of "inconsequential value and benefit to the estate." 11 U.S.C. § 554(b). I therefore granted the Credit Union's motion for abandonment. However, I denied the motion for relief from the stay because the Credit Union failed to establish that the Debtor did "not have an equity" in the mobile home, as required by § 362(d)(2)(A).[3] *But see In re Cohen,* 141 B.R. 1 (Bankr. D.Mass.1992). I also authorized Mr. Bagley to file photocopies of both reaffirmation agreements, deeming them to be originals for purposes of § 524(c).

On July 26, 1991, the Debtor filed a motion requesting that I find the Credit Union in contempt for violating the automatic stay and for unlawfully discriminating against him. The Debtor also requested that I: (1) order the Credit Union to restore his membership privileges; (2) enjoin the Credit Union from freezing or offsetting his account; and (3) enjoin the Credit Union from repossessing the mobile home absent some post-petition default by the Debtor. On August 1, uncontested copies of both reaffirmation agreements were filed by Mr. Bagley. On August 15, the discharge was entered. An evidentiary hearing on the Debtor's motion was conducted on October 9, 1991. After reviewing post-hearing briefs, I determine that I have jurisdiction under 28 U.S.C. § 1334 and that this dispute is a core proceeding, 28 U.S.C. § 157(b)(2)(A), (C), and (O). Pur-

---

**2.** The original loan agreement relating to the mobile home, Creditor's Exhibit A, provides: "You will be in default if you ... file for bankruptcy or become insolvent, that is, unable to pay your obligations when they become due." It is the violation of this provision which the Credit Union cited as the sole default entitling it to repossess the mobile home.

**3.** Pursuant to § 362(c)(1), the automatic stay terminates with respect to property which ceases to be estate property, as would occur in the case of abandonment. But that subsection refers only to "the stay of an act against *property of the estate.*" (emphasis added). The stay im-

posed by § 362(a) of any other acts remains in effect until the case is closed, dismissed or, with exceptions not relevant here, the debtor receives or is denied a discharge. 11 U.S.C. § 362(c)(2). *See In re Bell,* 700 F.2d 1053, 1057–58 (6th Cir. 1983). Since none of these events had occurred as of the hearing, and since several provisions under § 362(a) encompass nonestate property— *see, e.g.,* § 362(a)(5)—my decision to grant the motion for abandonment did not moot the Credit Union's request for relief from the stay. *See generally* Jalbert, *Abandonments Under the New Bankruptcy Code,* Comm.L.J. Oct. 1981, pp. 360–61.

suant to F.R.Bankr.P. 7052, made applicable to this contested matter by F.R.Bankr.P. 9014, I now render my conclusions of law on the substantive issues in dispute.

### ARGUMENTS OF THE PARTIES

The Debtor argued that the Credit Union's actions in this case "have been coercive, abusive and discriminatory." P. 7 of Debtor's Brief in Support of Motion for Contempt. He claimed to have "suffered considerable anguish as a result of [the Credit Union's] illegal threats and improper actions." *Id.* The motion raised two principal issues.

The Debtor argued that by discontinuing its services to him, the Credit Union is guilty of unlawful discrimination in violation of § 525(b). The response of the Credit Union was that § 525(b) is inapplicable because it is not the Debtor's employer.

Second, the Debtor argued that the actions taken by the Credit Union, whether viewed in isolation or seen as a whole, constituted a violation of the automatic stay imposed by § 362(a)(6). Specifically, he identified the following actions by the Credit Union as contrary to the stay: (1) refusing to allow him to withdraw prepetition funds in his share account;[4] (2) threatening to repossess his mobile home, and actually commencing relief from stay proceedings to permit such repossession; (3) failing to stop his payroll deductions after he requested that it do so and informing him that his payroll deductions would continue according to the same terms as prepetition unless terminated by the Debtor; (4) discontinuing his member services; (5) maintaining a policy of not allowing reaffirmation as to secured debts unless a member also reaffirms unsecured debts; and (6) refusing to file the reaffirmation agreements. The Credit Union denied that any of these actions, either separately or in combination, violated § 362(a).

For the reasons explained below, I conclude that the Credit Union did not violate § 525(b), but that it did violate the automatic stay. I also hold that the Debtor is entitled to an order enjoining the Credit Union from repossessing the mobile home absent default by the Debtor other than violation of the bankruptcy clause contained in the underlying loan agreement.

#### I. Discrimination under § 525(b)

■ Section 525(b) reads as follows:

No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

The Debtor claimed that the Credit Union violated this subsection when it terminated his membership, which the Debtor characterized as a benefit of his employment with General Motors. The Credit Union argued in response that § 525(b) is inapplicable here because the Debtor has never been employed by the Credit Union.

It is not clear whether § 525(b) applies to any "private employer" or if it is instead limited to private employers *of the debtor.* *Compare In re Spaulding,* 116 B.R. 567, 572 (Bankr.S.D.Ohio 1990) ("[Section] 525(b) is inapplicable to this proceeding since it pertains to a private employer's termination of the employment of a debtor-employee and that is not the situation presented by the facts in this proceeding."); *In re Madison Madison Int'l of Illinois, P.C.,* 77 B.R. 678, 680, 16 B.C.D. 453 (Bankr.E.D.Wis.1987) ("[Section] 525(b) prohibits discrimination by a 'private employer.' It is therefore implicit that there

---

**4.** The Debtor argued that this action also violated §§ 362(a)(3), (4), (5) and (7).

be an existing employer-employee relationship between the parties.") *with In re Patterson,* 125 B.R. 40, 24 C.B.C.2d 1671 (Bankr.N.D.Ala.1990); *In re Callender,* 99 B.R. 378 (Bankr.S.D.Ohio 1989); *In re Brown,* 95 B.R. 35, 18 B.C.D. 1406 (Bankr. E.D.Va.1989) (all cited by the Debtor and supporting the proposition that a debtor need not actually be employed by the discriminating party to prevail under § 525(b)).[5] But I will not decide this issue because, even if it were decided in the Debtor's favor, his contention that the Credit Union's action is subject to § 525(b) still fails.

Broadly stated, § 525(b) prohibits private employers from "discriminat[ing] with respect to [the debtor's] employment." Given the text of the statute, the quoted language could plausibly be interpreted as referring only to employment (past, present or prospective) with the party taking the discriminatory action, or as also encompassing employment with an entity other than the discriminatory party. The Debtor argued for the latter interpretation. But a substantial problem arises if the statute is so read.

A debtor subjected to employment-related discrimination at the hands of a party who is neither a past, present or prospective employer of the debtor would presumably suffer just as much (or little) if the party happens not to be an employer (of anyone) as he would if the party was in fact an employer (of someone). Yet because § 525(b) is limited to "employers," a broad construction of that statute would make this seemingly pointless distinction critical.

Thus according to the Debtor's interpretation of § 525(b), the propriety of the Credit Union's conduct would turn on whether the Credit Union employs people: if it does not, then the Debtor has no cause of action.[6] Neither the Debtor nor the cases he cited offered any evidence that Congress intended to differentiate employers from nonemployers in this fashion, nor do they propose any explanation—let alone a plausible one—as to why such a distinction should be made.

If, on the other hand, the reference in § 525(b) to "employment" is understood as meaning employment (past, present or prospective) with the entity taking the discriminatory action—an inference which is at least as plausible as the broader interpretation suggested by the Debtor—then the distinction between what is and what is not subject to the statute makes sense. Entities who are in a position to fire, or have an opportunity to deny employment to, debtors based solely on the fact of bankruptcy clearly pose a more serious threat to the debtor's livelihood than do entities having not even a prospective employment relationship with the debtor.

It is axiomatic that statutes should be construed whenever possible so as to avoid absurd results. *See Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 333, 59 S.Ct. 191, 200, 83 L.Ed. 195 (1938). Because § 525(b) would otherwise require absurd distinctions along the lines discussed, I conclude that an action can constitute a violation of § 525(b) only if

---

5. The merit of these respective positions depends to a great extent on whether the refusal to hire a debtor because of bankruptcy is actionable under § 525(b). *Compare Comeaux v. Brown & Williamson Tobacco Co.,* 915 F.2d 1264, 1269 (9th Cir.1990) (where the court appears to assume that an employer's "fail[ure]" to employ" the debtor could violate § 525(b)) *with Madison,* 77 B.R. at 682 (attaching significance to the fact that § 525(a)'s provision prohibiting governmental units from "deny[ing] employment to" the debtor based on bankruptcy "was not carried over to § 525(b)"). If failure to employ is actionable, then § 525(b) necessarily covers private employers who do not employ the debtor.

6. Of course, the Credit Union has employees, and so could not escape liability here based on the irrelevant fortuity that it is not an employer. But the next case could involve, say, a physician participating in an employer-provided group medical plan who refuses to treat the debtor because of his bankruptcy. It is difficult to understand why the outcome of that case should be determined by subtleties such as whether the receptionist at the physician's clinic is employed by the physician or by a company that owns the building and leases office space to the physician.

it relates to the debtor's employment with the entity taking the action. Since that is not the case here, § 525(b) is not implicated.

■ Even if I were to conclude that discrimination which relates to the debtor's employment with an entity other than the discriminating party may be subject to § 525(b), the Debtor's argument would be unavailing. Section 525(b) prohibits employers from discriminating against a debtor or *"solely* because such debtor" filed for bankruptcy. (emphasis added). The evidence is uncontroverted that the Credit Union's policy applies equally to *any* member causing the Credit Union a loss, not just those members who subject it to a bankruptcy-related loss.[7] Thus the policy did not improperly discriminate pursuant to § 525(b). *See Duffey v. Dollison,* 734 F.2d 265, 273 (6th Cir.1984); *In re Henry,* 129 B.R. 75, 78 (Bankr.E.D.Va.1991) ("The credit union's policy ... is applied in a nondiscriminatory manner to bankruptcy debtors and nondebtors alike who cause a financial loss by not paying their debt.").

For these reasons, I conclude that the Credit Union did not violate § 525(b).

### II. Administrative Freeze as a Violation of § 362(a)(3), (4), (5) & (7)

As noted, the Debtor argued that the Credit Union's freeze[8] constituted a violation of § 362(a)(6), as well as subsections (3), (4), (5) and (7) of § 362(a). To facilitate the analysis of these allegations, however, I will separately consider § 362(a)(6).

■ Because §§ 362(a)(3) and (4) relate solely to property of the estate, it is difficult to understand how the Credit Union violated those provisions in this case. By definition, a debtor no longer has rights in estate property: the trustee acquires all such rights upon commencement of the case. Thus the refusal of the Credit Union to release property of the estate to the *Debtor* (as opposed to the trustee) clearly is not a stay violation; indeed, such a refusal would be entirely prudent and appropriate. I therefore summarily reject the Debtor's contention that the Credit Union violated §§ 362(a)(3) or (4) by freezing the funds in question, and will instead focus on whether the freeze constituted a violation of §§ 362(a)(5) or (7).

Section 362(a)(5) precludes creditors from taking "any act to create, perfect or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." The Credit Union froze the Debtor's account based on its asserted right of setoff, a right which is frequently referred to as a "banker's lien." *See, e.g., In re New York City Shoes,* 78 B.R. 426, 429, 16 B.C.D. 596, 17 C.B.C.2d 694 (Bankr.E.D.Pa.1987). And although a depositor loses "ownership" rights in funds deposited in a general account, *see Union Guardian Trust Co. v. Emery,* 292 Mich. 394, 414, 290 N.W. 841 (1940), the deposit does create a chose in action—the depositor's right of payment—which can be made subject to a security interest. *See In re CJL Co.,* 71 B.R. 261, 264–66 (Bankr.D.Or. 1987).

■ Here it appears that the Debtor granted the Credit Union a security interest in his shares, as the Security Agreement executed in connection with the mobile home loan specifically provided that the "loan is also secured by all the shares and deposits in all your individual and joint accounts with the credit union now and in

---

**7.** Creditor's Exhibit I, a statement of Credit Union policy, indicates that "[n]o credit will be extended to any person who has caused a loss to the Credit Union or who is not voluntarily repaying the loss. The Credit Union has the right to rescind all services ... to any [such] persons...."

**8.** This term, which is not in the Bankruptcy Code, has been defined in this context as follows:

An administrative freeze ... occurs when a financial institution, ... upon receiving notice of a debtor's bankruptcy filing, prevents withdrawal from accounts that a debtor has at that institution. Typically, the debtor both owes the financial institution a debt and also has funds on deposit in a checking or savings account at a financial institution.
*In re Homan,* 116 B.R. 595, 598, 20 B.C.D. 1118 (Bankr.S.D.Ohio 1990).

the future." Exhibit A. Since a "security interest" is a kind of "lien," *see* 11 U.S.C. § 101(51), it would seem that the Credit Union's setoff right constitutes a lien.[9] *See also* 11 U.S.C. § 101(37) (defining a "lien" as an "interest in property to secure payment of a debt"); *In re Executive Associates*, 24 B.R. 171, 172, 7 C.B.C.2d 605 (Bankr.S.D.Tex.1982) ("If the bank has a valid lien on the bank account it is clear that the exercise of any such lien right is enjoined by § 362(a)(5).").

■ These considerations notwithstanding, I do not believe that a setoff is within the scope of § 362(a)(5). If a right of setoff is nothing more than a subspecies of lien for purposes of § 362(a), then subsection (a)(7), which refers specifically to setoffs, would be rendered redundant by subsections (a)(4) and (a)(5). Moreover, § 506(a) provides that secured claims include both claims which are "secured by a lien" and claims which are "subject to setoff." Thus the Code appears to have implicitly adopted the widely shared view[10] that a fundamental distinction exists between a setoff right and a lien. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 186 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 (acknowledging and describing the differences between a right to setoff and a security interest).[11] And at least for purposes of § 362(a), that distinction makes sense.

The enforcement of what might be called a "conventional" lien—say a security interest in the debtor's automobile—generally involves an affirmative act by the creditor: it can repossess the car or, if the car has already been repossessed, sell it as a means of satisfying the outstanding indebtedness. Section 362(a)(5), in conjunction with § 362(a)(4), precludes the creditor from taking such actions, which is of course consistent with the stay's essential purpose of preserving the *status quo* as of filing of the bankruptcy petition. *See ICC v. Holmes Transportation*, 931 F.2d 984, 987 (1st Cir.1991); *In re Lissner Corp.*, 98 B.R. 812, 820–21 (N.D.Ill.1989) ("The automatic stay freezes the rights of creditors at the time the bankruptcy petition is filed, assuring that 'the status of creditors as exists at the time of a debtor's filing is maintained.' " (quoting *In re Rogers*, 39 B.R. 295, 298 (Bankr.W.D.Ky.1984))).

---

9. Here and on numerous occasions throughout this opinion, I interpret the statute under consideration with reference to other provisions of the Bankruptcy Code. This is appropriate because statutes *in pari materia* "should be construed together." 2A N. Singer, *Sutherland Stat. Const.* § 51.02 (4th ed.1991). *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (describing "[s]tatutory construction" as "a holistic endeavor"); *Hammontree v. NLRB*, 925 F.2d 1486, 1496 (D.C.Cir. 1991) ("[C]ourts are obligated to construe statutes harmoniously whenever possible."); *In re Norton*, 867 F.2d 313, 317 (6th Cir.1989); (noting that a statutory exception must be "examine[d] ... in the context of the entire statutory scheme").

10. *See, e.g., Griffin v. Continental American Life Ins. Co.*, 722 F.2d 671, 673 (11th Cir.1984) ("A bank's right to set-off against a depositor's account is often loosely referred to as a 'banker's lien,' but the 'lien' usage has never led anyone to think that the bank held a security interest in the bank account." (quoting Gilmore, *Security Interest in Personal Property* (1965), pp. 315–16)); *Guilds v. Monroe County Bank*, 41 Mich. App. 616, 619, 200 N.W.2d 769 (1972) (The "right of a bank with respect to general deposits is more accurately [called] a right of setoff

[rather than a lien]." (quoting 10 Am.Jur.2d, Banks, § 666 pp. 636–37)).

11. A much venerated principle of statutory construction provides that, "[w]here a statute is clear on its face, its plain meaning should be given effect without reference to legislative history." *Arbour v. Jenkins*, 903 F.2d 416, 421 (6th Cir.1990). But the tension noted between § 362(a)(5) and other provisions of the Code creates an ambiguity that renders this so-called "plain meaning rule" inapplicable. *See United States v. Fairman*, 947 F.2d 1479, 1481–82 (11th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1503, 117 L.Ed.2d 642 (1992); *Parker v. Dole*, 668 F.Supp. 1563, 1569 (N.D.Ga.1987); *see also supra* n. 9 (collecting cases for the proposition that a statutory provision should not be construed in isolation from other provisions in the same statute).

Even in the absence of this ambiguity, the plain meaning rule should not be invoked here because it is plausible that Congress did not intend setoffs to be encompassed within the term "lien." *See In re Idalski*, 123 B.R. 222, 228–29 (Bankr.E.D.Mich.1991) (suggesting that the plain meaning rule "should be applied where the statutory construction urged by a party is so inherently improbable that it defies common sense," but not where the construction "is at least plausible").

■ But whereas a lien confers the right to take some kind of affirmative action against the debtor's collateral, a setoff right is in a sense the right to do nothing: a creditor with a right of setoff can "rightfully" disregard the debtor's demand for payment to the extent of the amount subject to setoff. Thus the only means of "enforcing" a setoff right that really matters—from both the creditor's and the debtor's perspective—is the creditor's refusal to repay a mature and otherwise valid indebtedness.[12] If § 362(a)(5) applied to the enforcement of setoff rights, then, a creditor asserting such a right would logically be required to immediately honor repayment demands notwithstanding its right of setoff.[13]

Thus in contrast to lienholders who are simply prohibited by § 362(a)(5) from trying to better their position vis-a-vis other creditors, a creditor holding a right of setoff would actually be required by that subsection to take an action—repayment of a loan notwithstanding a mutual debt owed to it—which will almost inevitably operate to its detriment. *Compare Citizens Bank of Maryland v. Strumpf*, 138 B.R. 792, 794 (D.Md.1992) ("The ironic result for Citizens Bank was that it was held in contempt [for freezing the debtor's checking account pending consideration of its motion for relief from automatic stay and for setoff], was later granted its Motion . . ., but could not exercise its right to setoff because (as predicted by Citizens Bank) Strumpf had removed the money from the checking account."). Notice that a debtor has filed bankruptcy may operate as a kind of cease-fire order, but it does not mean that a

creditor has to shoot himself in the foot. *See In re Edgins*, 36 B.R. 480, 484, 11 B.C.D. 585, 10 C.B.C.2d 120 (9th Cir. B.A.P. 1984) ("The shield of 11 U.S.C. Section 362 . . . should not be used [by the debtor] as a sword . . . .").

In light of these considerations, I conclude that a setoff right is not a "lien" for purposes of § 362(a)(5). Accordingly, I reject the Debtor's contention that the Credit Union violated that provision by freezing his account.

■ The Debtor also argued that the freeze violated § 362(a)(7). That subsection states that the stay arising under § 362(a) applies to "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." The $5.00 in his account when the Debtor filed bankruptcy was a prepetition debt owed by the Credit Union to him. *Union Guardian Trust*, 292 Mich. at 414, 290 N.W. 841; *Edgins*, 36 B.R. at 483; *In re Learn*, 95 B.R. 495, 496 (Bankr.N.D.Ohio 1989). From the moment his petition for relief was filed, however, all of the Debtor's property—including this chose in action against the Credit Union—became property of the estate. 11 U.S.C. § 541. Therefore, for the same reason that the Debtor lacked standing to assert violation of § 362(a)(3) or (4), he lacked standing to assert violation of § 362(a)(7) while the asset was property of the estate.

But while the Credit Union had no obligation to honor a repayment demand by the Debtor so long as the Debtor's right of payment belonged to the estate, that right,

---

**12.** The courts are split on the question of whether the refusal to pay a debt on demand based on a claimed right of setoff is equivalent to a setoff. *Compare In re Cusanno*, 17 B.R. 879, 882, 8 B.C.D. 989 (Bankr.E.D.Pa.1982) (declining to recognize a distinction between a setoff and an "administrative hold" for purposes of § 362(a)(7), noting that in *Goldstein v. Jefferson T & T Co.*, 95 Pa.Super. 167, 170 (1928), the court "held that a bank's refusal to honor checks drawn on the plaintiff's account . . . was 'sufficient evidence of intent' to make a setoff") *with Baker v. National City Bank of Cleveland*, 511 F.2d 1016, 1018 (6th Cir.1975) (implying that a bank's setoff "is not complete" under Ohio law until the bank has made the appropriate "book

entries"). I believe *Cusanno* represents the better view. *See infra* n. 16. But even if such refusal is deemed not to be a setoff, it clearly is an act taken with a view toward exercising a setoff right, and thus would constitute an "act to . . . enforce" the setoff/lien in violation of § 362(a)(5).

**13.** Although § 542(b) arguably authorizes creditors holding a right of setoff to refuse a turnover request made by the trustee, *see infra* n. 17 and accompanying text, that subsection would not be applicable in cases involving § 362(a)(5) and nonestate property.

which the Debtor claimed as exempt pursuant to § 522(d)(5), lost its status as estate property when no timely objection to the Debtor's claim of exemption of this account was filed. *In re Hahn,* 60 B.R. 69, 73, 14 B.C.D. 446 (Bankr.D.Minn.1985) ("Once a debtor's claim of exemption to property has been allowed by the running of the period for objection to the claim of exemptions under [F.R.Bankr.P.] 4003(b), the property revests in the debtor and is no longer property of the estate."); *In re Williamson,* 11 B.R. 791, 797 (Bankr.W.D.Pa.1981). Since the Credit Union's freeze continued past the deadline for filing such an objection, the Debtor does have standing to argue a § 362(a)(7) violation thereafter.

█ Whether an administrative freeze violates § 362(a)(7) is a matter of much debate. *See generally Patterson,* 125 B.R. at 45 (collecting cases both pro and con on this issue). For the reasons which follow, however, I believe that the exempted asset—the debt owed by the Credit Union to the Debtor—lost the protection afforded by § 362(a)(7) once ownership of the asset revested in the Debtor.

As noted, § 362(a)(7) is limited to "debt[s] owing to the debtor that arose before the commencement of the case." The quoted language tracks the definition of estate property found in § 541(a), a parallel which suggests that § 362(a)(7) is designed solely to protect the estate.[14] Several considerations support this inference.

Section 362(a) includes provisions which inure to the direct benefit of the debtor. *See* §§ 362(a)(1), (2) and (5). However, a creditor's compliance with these provisions would not require it to void its own security interest. Section 362(a)(5), for example, simply precludes the creditor from creating, perfecting or enforcing a lien against the debtor's property; it does not require the creditor to return the collateral to the debtor. In other words, a creditor violates none of these stay provisions by refusing to release to the debtor collateral that was validly repossessed prior to commencement of the bankruptcy proceeding. *See In re Richardson,* 135 B.R. 256, 259 (Bankr. E.D.Tex.1992) ("In maintaining the seized property in the status it enjoyed just before the filing of debtor's petition, a creditor is merely complying with the spirit of the § 362 freeze.").[15]

If a creditor is prevented by § 362(a)(7) from setting off its claim against nonestate property, however, the creditor is in effect required to surrender its "collateral"—the debtor's right of payment—and receive nothing in return.[16] *See supra* pp. 447–448. And whereas the trustee or debtor in

---

14. If § 362(a)(7) was designed to encompass nonestate property, the limitation to prepetition debts seems rather arbitrary: Debts owed to the debtor that accrue while the bankruptcy is pending would appear to be no less worthy of protection than those accruing prepetition.

15. There is authority for the proposition that such retention violates the automatic stay. *See In re Knaus,* 889 F.2d 773, 775 (8th Cir.1989). I believe, however, that *Richardson* is correct. In any event, *Knaus* relied on § 362(a)(3), a subsection which is expressly limited to estate property, and § 542(a), which obliges creditors to deliver property in their possession *to the trustee* unless the "property is of inconsequential value or benefit *to the estate.*" (emphasis added). I am aware of no decision to the effect that a creditor who legally repossessed property prepetition is required under § 362(a) to return the property to the debtor, notwithstanding the fact that the collateral is not property of the estate.

16. This analysis assumes that the refusal to honor a demand for repayment of a debt based on a setoff right is tantamount to setoff. But since the right to declare a setoff is in essence the right to refuse a payment demand, I believe this assumption is reasonable. *See, e.g., Cusanno, supra* n. 12; *In re Executive Associates,* 24 B.R. 171, 172, 7 C.B.C.2d 605 (Bankr.S.D.Tex.1982); *In re Mealey,* 16 B.R. 800, 802, 5 C.B.C.2d 1345 (Bankr.E.D.Pa.1982); B. Clark, *The Law of Bank Deposits, Collections and Credit Cards,* ¶ 11.9 (1981) ("[F]ormal bookkeeping entries are not required to perfect a setoff." (*quoted in In re Saugus General Hospital,* 698 F.2d 42, 48 (1st Cir.1983))); Wynn, *Freeze and Recoupment: Methods for Circumventing the Automatic Stay?* 5 Bankr.Dev.J. 85, 100 (1987) ("A bank is in the position of controlling the debtor's funds and by mere administrative 'neglect' is able to circumvent the automatic stay. . . . It seems inconceivable that Congress intended that result." (*quoted in Homan,* 116 B.R. at 604))). *But see, e.g., Baker, supra* n. 12; *In re First Connecticut Small Business Investment Co.,* 118 B.R. 179, 181 n. 1, 23 C.B.C.2d 928 (Bankr.D.Conn.1990); *In re Lee,* 40 B.R. 123, 126, 11 B.C.D. 1356 (Bankr. E.D.Mich.1984).

possession would probably be prohibited by § 363 from using any funds released by a creditor that asserts a setoff right, *see In re Quality Interiors*, 127 B.R. 391, 395–96, 24 C.B.C.2d 1823 (Bankr.N.D.Ohio 1991), it is clear that the debtor would not be so restricted with respect to the use of nonestate funds. There is no apparent reason why Congress would undermine the position of such creditors, not for the benefit of the estate and all creditors, but for the exclusive benefit of the debtor.

Finally, § 542(b) states that "an entity that owes a debt that is property of the estate ... shall pay such debt to ... the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor." Although the utility of this provision depends on how courts reconcile it with § 362(a),[17] it obviously is intended to provide some kind of protection to creditors asserting a right of setoff. Yet if § 362(a)(7) includes within its scope both estate and nonestate property, then § 362(a)(7) and § 542(b) are not coextensive: Via the latter subsection, Congress expressly protected the setoff rights of any creditor owing a debt that is estate property, but established no such protection with respect to a creditor claiming a setoff right against a debt that is nonestate property. Again, I find it unlikely that Congress would favor debtors over trustees in this fashion.

■ The puzzling incongruity between §§ 362(a)(7) and 542(b), as well as the other considerations mentioned, lead me to conclude that the implicit assumption animating § 362(a)(7) is that the debt owed by the creditor is in fact property of the estate. To the extent that that is not (or no longer) true, then the debt, although within the literal terms of § 362(a)(7), is not within its intended scope. Under such circumstances, the court may adopt a nonliteral interpretation of the section under scrutiny, even though the section appears to be worded unambiguously and a literal construction would not produce an absurd result, if it determines that doing so is necessary to effectuate legislative intent. *See United States v. Ron Pair Enterprises*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (If " 'the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' ..., [then] the intention of the drafters, rather than the strict language, controls." (quoting *Griffin v. Oceanic Contractors*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982))).[18] Accordingly, I hold that § 362(a)(7) is restricted to estate property. Because that subsection does not prevent a creditor from refusing to repay a prepetition indebtedness which

**17.** *Compare, e.g., In re Williams*, 61 B.R. 567, 573, 15 C.B.C.2d 70 (Bankr.N.D.Tex.1986) ("[T]he specific permission granted to a creditor in Section 542(b) to retain funds subject to setoff should prevail over ... Section 362(a)(7) ... [and] the general prohibition in Section 362(a)(3) which forbids acts to exercise 'exclusive control' over property of the estate.") *with, e.g., Homan*, 116 B.R. at 604 ("Although the court acknowledges the opportunity that § 542(b) extends to creditors with debts subject to setoff,.... Kemba's act of freezing the debtor's account is a violation of § 362(a)(3).") *and In re Rio*, 55 B.R. 814, 817–18 (Bankr.M.D.Ala. 1985) (reasoning that, because § 542(b) is explicitly subject to § 553, which in turn "is clearly subject to" § 362(a)(7), "[t]he act of freezing an account is ... stayed by § 362(a)(7)").

**18.** The fundamental purpose of statutory construction is to apply the statute in the manner intended by the legislature. *See Thompson v. Thompson*, 218 U.S. 611, 617, 31 S.Ct. 111, 112, 54 L.Ed. 1180 (1910). A "literal" interpretation—i.e., one which most easily squares with the wording of the statute in question—is justified in most cases because it usually serves that purpose. But while it is entirely logical and appropriate for the court to start with the presumption that a literal interpretation of the words of a statute will accurately reflect legislative intent, that presumption is generally subject to rebuttal. *Ardestani v. INS*, — U.S. —, —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496, 505 (1991) (characterizing the inference "that the plain language of the statute expresses congressional intent" as a "strong presumption," but one which can be "rebutted ... when a contrary legislative intent is clearly expressed"); *Union Bank v. Wolas*, — U.S. —, —, 112 S.Ct. 527, 530, 116 L.Ed.2d 514, 521 (1991) (where the Court implicitly acknowledged that the language of even a clearly worded statute does not automatically control, when it stated that, "[g]iven the clarity of the statutory text, respondent's burden of persuading us that Congress intended to create or to preserve [an exception to the statute under scrutiny] is exceptionally heavy").

is not property of the estate, the Credit Union did not violate it by advising the Debtor that the funds in his account had been frozen.

In summary, the Credit Union's administrative freeze of the Debtor's $5.00 did not implicate §§ 362(a)(3), (4) or (7), because those subsections inure only to the benefit of the trustee. And since the right to setoff is not a "lien" for purposes of § 362(a)(5), that subsection too is inapplicable. Therefore, the administrative freeze did not violate § 362(a)(3), (4), (5) or (7).

### III.  Violation of § 362(a)(6)

The Debtor contended that numerous actions taken by the Credit Union constitute a violation of § 362(a)(6). The only such action that the Debtor explicitly argued violated that provision independent of any other actions was the freeze placed on the Debtor's account. Nevertheless, I will look at each of the actions separately, in addition to considering whether the overall conduct of the Credit Union is actionable under § 362(a)(6).[19] Before doing so, however, I hope to clarify the kinds of actions which § 362(a)(6) prohibits.

The automatic stay imposed by § 362(a)(6) pertains to "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." Restated for the sake of simplicity, subsection (a)(6) precludes any act to collect a prepetition debt.

It is safe to assume that subsection (a)(6) includes within its scope collection efforts such as lawsuits and garnishments. By these actions, the creditor is attempting to collect the debt notwithstanding the debtor's unwillingness to pay.

It is equally safe to assume that subsection (a)(6) does not contemplate collection efforts which involve consensual repayment. This conclusion is reinforced by § 524(f), which advises that "[n]othing con-

tained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt."[20] Thus if a debtor makes an unsolicited payment to a creditor, the creditor does not violate subsection (a)(6) by depositing it and crediting the debtor's account. Even though the creditor has taken an action to collect a prepetition debt, subsection (a)(6) is not implicated because the payment was voluntary. Whether § 362(a)(6) is inapplicable in this scenario because the statute does not cover voluntary payments or because the debtor in such case has waived the right to invoke the statute is not important. Either way, the debtor has no cause of action under that subsection.

The more difficult question is whether actions taken by a creditor which are intended to motivate the debtor to voluntarily repay a prepetition debt necessarily violate § 362(a)(6). For the following reasons, I believe that not all such actions are contrary to § 362(a)(6).

If subsection (a)(6) is construed as prohibiting any actions by the creditor aimed at obtaining the debtor's consent to repay a prepetition debt, then the creditor's ability to negotiate reaffirmation agreements is essentially destroyed. After all, any effort by the creditor to define repayment terms—such as the applicable interest rate or monthly payment amount—is an attempt to obtain the debtor's consent to reaffirm the debt according to those terms. And if, heaven forbid, the creditor should couple its proposed repayment terms with a threat to repossess the collateral securing the debt if the terms are not accepted, then its violation of § 362(a)(6) is all the more blatant. To avoid running afoul of a literally applied § 362(a)(6), then, the creditor would have to remain steadfastly passive in all repayment discussions—accepting or rejecting the debtor's proposals, but never suggesting new or different terms. I find

---

19. This approach is preferable for analytical purposes, and it also provides more useful information to creditors for future reference. For example, an opinion which simply holds in effect that a creditor cannot do X, Y and Z leaves unanswered the question of whether any one or

two of those actions, separately or combined, would violate § 362(a).

20. Although § 524 deals with the effect of the discharge, subsection (f) thereof is not by its terms restricted to postdischarge repayments.

it inherently unlikely that Congress intended to muzzle creditors in this fashion, and several considerations reinforce this skepticism.

Subsection 524(c) enumerates the criteria which must be met in order to render a reaffirmation agreement enforceable, and there is no indication there that the agreement would be invalidated if it is established that any of its terms are the product of the creditor's negotiation efforts. Yet for the reason mentioned, a strict interpretation of § 362(a)(6) would create that startling result: By "actively" negotiating the agreement, the creditor would have violated the stay and, as many courts have stated, actions taken in violation of the stay are void *ab initio. See, e.g., NLRB v. Edward Cooper Painting,* 804 F.2d 934, 940 (6th Cir.1986).

A more specific indication that Congress did not view § 362(a)(6) as an impediment to the natural negotiation process between creditors and debtors is found in § 524(c)(3)(A). That subsection provides that a certificate signed by the debtor's attorney in connection with a reaffirmation agreement must declare that the debtor was "fully informed" with respect to the agreement. And since the debtor is presumably not "fully informed" about a reaffirmation agreement unless he is aware of the implications should he fail to execute the agreement, the notion that § 362(a)(6) precludes a creditor from making plain its intentions should the debtor not reaffirm is clearly contrary to the principle of full disclosure which Congress apparently favored in the reaffirmation process.[21]

Strict interpretation of § 362(a)(6) also runs counter to the Consumer Credit Amendments enacted in 1984. A stated objective of those amendments was to facilitate reaffirmation agreements. *See In re Pendlebury,* 94 B.R. 120, 124, 18 B.C.D. 999 (Bankr.E.D.Tenn.1988). Yet by imposing a kind of gag order on creditors, a reaffirmation agreement will be reached only if, a) the debtor is aware of the right

to reaffirm, b) the debtor initiates reaffirmation agreements with the creditor, and c) the parties are able to reach an agreement despite the creditor's inability to negotiate in its own behalf. Thus a strict application of § 362(a)(6) would severely hamper a process that Congress, through the 1984 amendments, tried to simplify.

The court in *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81 (3d Cir.1988), identified yet another problem raised by a literal interpretation of § 362(a)(6). As discussed, § 525 implicitly allows nongovernmental entities, other than the employer (or, possibly, a prospective employer) of the debtor, to discriminate against the debtor because she filed bankruptcy. But since, for example, "any refusal of future services by a present creditor has some coercive impact" on a debtor's repayment decision, 851 F.2d at 85, reading § 362(a)(6) as barring all such coercive actions would prohibit conduct which, by negative inference, is generally permitted under § 525. *Id.* ("The debtor could do indirectly through § 362 and § 524 [i.e., require a creditor to continue services to her] what she cannot accomplish directly through the anti-discrimination provision. We cannot find that Congress intended this result.").

Finally, an interpretation of § 362(a)(6) which prevents creditors from negotiating reaffirmation agreements would significantly impair the bankruptcy process. A deeply rooted principle of American jurisprudence is to favor settlement and, conversely, to discourage litigation. *See American Security Vanlines v. Gallagher,* 782 F.2d 1056, 1060 (D.C.Cir.1986); *Dawson v. Pastrick,* 600 F.2d 70, 75 (7th Cir.1979). A strict interpretation of subsection (a)(6) would have the opposite effect: Creditors would be chilled from engaging in (let alone initiating) reaffirmation discussions, preferring instead to proceed immediately with "plan B"—whether that be a § 523 action, repossession of collat-

---

**21.** The fact that the § 524(c)(3) certificate is to be signed by the attorney who "represented the debtor in the course of *negotiating* [the reaffirmation] agreement" (emphasis added) is also significant. Negotiation is by its nature a two-way street, and it is difficult to imagine how the debtor's attorney could "negotiate" anything with a creditor who could not "negotiate" back.

eral, or some other alternative. And once litigation is commenced, the creditor would be wary of attempts to settle the dispute via reaffirmation. Indeed, even where the creditor is determined to negotiate a reaffirmation agreement, its safest course would be to first file a motion for relief from stay to allow it to do so—with the additional expenses that that procedure would entail.

In short, a literal interpretation of § 362(a)(6) creates tension between that subsection and other provisions in the Code, and suffers from terminal impracticality. Given these problems, and the lack of any clear indication from Congress to support such an interpretation, I conclude that a creditor does not violate § 362(a)(6) simply by attempting to obtain a debtor's consent to repay an indebtedness. *Cf. Beneficial Corp. and Subs. v. United States*, 814 F.2d 1570, 1576 (Fed.Cir.1987) ("If, of course, a practical problem bears on the issue of Congressional intent, we will consider it when construing the statute."); *United States v. O'Donovan*, 178 F.2d 810, 811–12 (7th Cir.1949) ("Practical consideration of the problems involved serves to strengthen the conclusion that this interpretation of the statute is correct."); *see also supra* n. 18 and accompanying text (collecting cases on statutory interpretation).

But that does not mean that a creditor can solicit voluntary repayment with impunity. A "purpose of the stay, to which Congress specifically addressed subsection 362(a)(6), is to prevent harassment of the debtor by sophisticated creditors. Sen.Rep. No. 989 at 50–51, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 5836–37; H.Rep. No. 595 at 125–26, 342, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 6086–87, 6298." *Morgan Guar. Trust Co. v. American Sav. & Loan*, 804 F.2d 1487, 1491 (9th Cir.1986), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). *See also* L. King, 2 *Collier on Bankruptcy*, ¶ 362.04 (15th ed. 1992).

Obviously, collection efforts that constitute harassment are proscribed by § 362(a)(6). But many authorities have also cited creditor "coercion" as being violative of that subsection. *See, e.g., Morgan Guaranty*, 804 F.2d at 1491 ("[M]ere requests for payment are not barred [by § 362(a)(6)] absent coercion or harassment by the creditor."); *In re Sechuan City, Inc.*, 96 B.R. 37, 43, 18 B.C.D. 1177, 20 C.B.C.2d 995 (Bankr.E.D.Pa.1989) ("Section 362(a)(6) is intended to protect debtors from creditor coercion and harassment...."). And while I agree that "harassment" is not the only kind of creditor behavior prohibited by § 362(a)(6), I do not believe that the term "coercion" is definitive.

A traditional definition of the verb "coerce" is "to compel to an act or choice." *Webster's Ninth New Collegiate Dictionary* (1985). The term "compel," in turn, means "to cause to do or occur by overwhelming pressure." *Id.*

If that is what is meant by coercion, then creditors would have to refrain from making any statement that would convince the debtor that it is in his best interest to repay a debt. Presumably, the creditor's input in repayment discussions would have to be limited to information that would have only a "mild" or, perhaps, a "moderate" influence on the debtor; if the information might be determinative in the debtor's mind, the creditor must keep silent. Such distinctions are difficult to justify from a theoretical standpoint, and offer little guidance to creditors concerning what is and is not permissible.

Moreover, since a creditor with great leverage—such as the ability to foreclose on the debtor's residence—would almost inevitably cross the magical "coercion" line if it informed the debtor of its intent to exercise that option should the debtor fail to reaffirm, the coercion standard would resurrect most of the problems discussed with respect to a strict interpretation of § 362(a)(6). I therefore do not believe that the standard functions as an acceptable test.

I do believe, however, that those courts which speak in terms of creditor "coercion" are on the right track. The word has an undeniable pejorative connotation, and it is

that extra "baggage," rather than its precise definition, which I believe captures the essence of what is prohibited by subsection (a)(6). The relevance of this distinction can be illustrated by the following hypotheticals.

In the first scenario, creditor A tells debtor A that if the debtor does not reaffirm a debt secured by the debtor's only vehicle, the creditor will repossess it.

In the second scenario, creditor B holds an unsecured claim against debtor B and a security interest in one of several televisions owned by debtor B's sister for her separate debt. The sister's obligation is in technical default. Creditor B tells the debtor that it will repossess his sister's TV if he refuses to reaffirm.

Comparing these two scenarios, debtor A is probably under more pressure to reaffirm than is debtor B: using the term "coercion" in its neutral, nonpejorative sense, I would say that creditor A is acting in a more coercive fashion than creditor B.

But if one focuses on the negative connotation associated with the term, I believe most people would agree that it is only creditor B that is attempting to "coerce" the debtor. The basis for the distinction is the contractual and logical nexus between debtor A's refusal to repay and the act of repossession, a relationship which does not exist with respect to debtor B's repayment and the action threatened by creditor B. While the ultimatum in both scenarios is legal, only creditor B is "guilty" of coercion in its normative sense, because it is simply not "playing by the rules." *Compare In re Guinn*, 102 B.R. 838, 843, 19 B.C.D. 811, 21 C.B.C.2d 229 (Bankr. N.D.Ala.1989) (suggesting that a credit union which sought relief from the stay so that it could foreclose a mortgage may have violated § 362(a)(6), noting that "[e]ven the least sensitive notion of *good faith dealings* would condemn an effort of

a creditor to put a debtor in default on a debt by refusing the debtor's payment" (emphasis added)). And it is only behavior of the type exhibited by creditor B which I believe § 362(a)(6) is designed to prevent.

Having minimized the importance of what might be called the "technical" definition of coercion, however, I do not mean to suggest that that definition—which goes to the persuasive force that an act exerts on the target of the action—is totally irrelevant. If the act taken by a creditor is something which a reasonable person would not view as having an appreciable effect on the debtor's decision as to whether to voluntarily repay a prepetition indebtedness, then I do not believe that § 362(a)(6) is violated. But assuming that this minimum threshold is reached, the extent to which an action is likely to influence a debtor is not relevant.

In summary, an action [22] taken by a creditor in the process of seeking voluntary repayment of a prepetition indebtedness violates § 362(a)(6) only if the action (1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances.[23]

Broadly speaking, I believe that an action by a creditor which is illegal satisfies the second criterion, unless there is a colorable argument to be made for the legality of the action. Most people would agree that it is inappropriate for a creditor to attempt to pressure a debtor into repaying a debt by taking (or threatening to take) an action if the creditor could not advance a plausible legal theory establishing the existence of the asserted right.

Conduct which amounts to harassment would of course also be unfair for purposes of § 362(a)(6). Again, any reasonable per-

---

**22.** In this context, the term "action" includes the refusal to act and the communication of an intent to take an action or refrain from taking an action.

**23.** Although the fairness inquiry is arguably as vague as the "coercion" standard, its virtue is

that it gets closer to the heart of the matter. So while I may still have to contend with a slippery slope in applying this test, my consolation is in knowing that I am at least on the right mountain.

son would be offended by the notion that a creditor could, for example, make repeated late night phone calls to the debtor or threaten to place ads in the local newspaper calling the debtor a deadbeat as means of collecting a prepetition debt.

These latter examples demonstrate that "harassment" really should be viewed as a subspecies of "coercion," rather than as a form of conduct which is distinct from it. So instead of speaking in terms of "harassment or coercion," as many courts do, it is more appropriate to refer to "harassment or other forms of coercion that are unfair.".

With these considerations in mind, I will now apply the foregoing standard to the facts of this case.

A. The administrative freeze

■■■ The funds which the Credit Union subjected to an administrative freeze amounted to only $5.00, a sum which I do not believe would significantly influence a reasonable person's decision regarding reaffirmation of a $4,595 unsecured indebtedness. Thus the Credit Union's action does not satisfy the first part of the two-pronged test under § 362(a)(6).

Nor did the freeze meet the second criterion. For the reasons previously stated, the Credit Union did not violate § 362(a)(3), (4), (5) or (7) by implementing the freeze. And I see no basis for concluding that the freeze was otherwise unfair. Accordingly, I hold that the freeze imposed by the Credit Union did not constitute a violation of § 362(a)(6).

B. Repossession

■■■ Throughout the course of negotiations between the parties, the Credit Union's "threat" of repossessing the Debtor's mobile home was no doubt pervasive. But such pressure is inherent in the reaffirmation process; the only way the Credit Union could dispel it would be to renounce its security interest in the mobile home, and it would be absurd to require creditors to take such action to avoid violating § 362(a).

In reviewing the Credit Union's conduct, then, I must focus on affirmative acts that in essence rendered explicit the (always implicit) threat of repossession. In this regard, the Debtor identified two actions by the Credit Union: (1) the advice by the Credit Union to the effect that the Debtor need not make any more payments on his mobile home loan, as it intended to repossess the home; and (2) the relief from stay motion filed by the Credit Union for the purpose of repossessing the home.

Turning my attention first to the relief from stay motion, there is some support for the argument that such a motion can itself constitute a stay violation,[24] and a nonfrivolous argument can be made for that conclusion. If, for example, a creditor holding only an unsecured claim tries to harass the debtor into reaffirming the debt by seeking relief from the stay in order to repossess the debtor's automobile, then § 362(a)(6) would seem to be implicated. After all, such an action is clearly coercive. And since the motion has absolutely no legal merit, one could characterize the tactic as unfair.

But there is greater support for the proposition that a creditor does not violate the automatic stay by filing a pleading in the home bankruptcy court. *See In re North Coast Village, Ltd.*, 135 B.R. 641, 643–44, 22 B.C.D. 874 (9th Cir. BAP 1992) (collecting cases); *see also Holmes Transportation*, 931 F.2d at 987 ("The automatic stay ... preclud[es] and nullif[ies] most postpetition actions and proceedings against the debtor *in nonbankruptcy fora....*" (emphasis added)). I believe that these cases are correctly decided.

The legislative history relating to the automatic stay provides as follows:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws.... It stops all collection efforts ... Without it, certain

24. *See In re Guinn,* 102 B.R. 838, 843, 19 B.C.D. 811, 21 C.B.C.2d 229 (Bankr.N.D.Ala.1989) ("The Court ... is not required at this time to determine whether ... the filing of the creditor's motion for relief from the stay is, of itself, harassive and, therefore, coercive and, thus, a violation of [the automatic] stay.").

creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. *Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.*

H.R.Rep. No. 595, 95th Cong., 2d Sess. 340 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 6296–6297 (*quoted in In re Atlantic Business and Community Corp.,* 901 F.2d 325, 327 (3d Cir.1990) (emphasis added)). *See also, e.g., Brock v. Rusco Industries,* 842 F.2d 270, 273 (11th Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 221, 102 L.Ed.2d 212 (1988) ("The purpose behind the automatic stay provision is 'to facilitate the orderly administration of the debtor's estate.'" (quoting *Donovan v. TMC Industries,* 20 B.R. 997, 1001, 9 B.C.D. 536 (N.D.Ga.1982))).

This emphasis on an "orderly liquidation procedure" suggests that the automatic stay is designed to stop those collection efforts which occur *outside* the forum of the bankruptcy court. Rather than insulating the debtor from all such efforts, the objective of the stay is to insure that the wrath of creditors is funneled into the bankruptcy court, where it belongs.

As stated, *see supra* n. 18 and accompanying text, the court must sometimes interpret a statute in a manner at odds with its apparent meaning in order to give effect to the intent underlying the statute. And while the act of filing a pleading in the bankruptcy court may be seen as a violation of the "letter" of the § 362(a) stay, it does not violate its spirit. Thus I hold that the Credit Union did not violate § 362(a)(6) by filing its motion for relief from the automatic stay.

The next issue is whether the Credit Union's advice of imminent repossession was contrary to the stay. The statement could reasonably have been expected to have a significant impact on the Debtor's decision on whether to repay the unsecured indebtedness.[25] It might therefore constitute a violation of § 362(a)(6) if the Credit Union did not have a legal right to repossess.

To establish the illegality of the Credit Union's threatened repossession, the Debtor argued that the Credit Union was in fact precluded from repossessing the mobile home. He claimed that the Credit Union waived its right to enforce the bankruptcy clause contained in the security agreement by agreeing to the Debtor's reaffirmation of the debt which the mobile home secures.

The Credit Union implicitly conceded that its right to repossess the mobile home on the strength of a violation of the bankruptcy clause would be waived if it had signed an enforceable agreement with the Debtor for reaffirmation of the mobile home debt. But it denied that it entered into a valid reaffirmation agreement regarding the secured debt. Thus the issue of whether the Credit Union had a right to repossess the mobile home turns on the enforceability of that agreement.

The Credit Union did not contend that the mobile home reaffirmation agreement fails to meet any of the applicable requirements for enforceability enumerated in § 524(c). But that subsection becomes relevant only if the parties have in fact entered into an otherwise enforceable agreement. And the Credit Union argued that they did not because there was no meeting of the minds with respect to the terms of reaffirmation.

The agreements which the Credit Union signed and forwarded to Mr. Bagley's office were in effect an offer by the Credit

**25.** The Debtor had already reaffirmed the unsecured loan when the Credit Union advised him of its intention to repossess the mobile home. Thus the decision which such advice could be expected to influence actually related to certification of the unsecured reaffirmation agreement. But that does not change the analysis for purposes of § 362(a)(6), because an act to obtain such certification is an "act to collect" the

unsecured loan: since certification of a reaffirmation agreement obviates the need for judicial approval of the agreement pursuant to § 524(c)(6), the Credit Union's chances of obtaining an enforceable reaffirmation agreement (and, therefore, the Debtor's faithful performance of the agreement) would improve substantially if the agreement were certified.

Union to allow the Debtor to reaffirm the debts. And the Debtor understood that this offer was a "package deal"—i.e., he could only validly accept the offer by reaffirming both debts. But while it was clear that both debts had to be "reaffirmed," each party apparently had a different understanding as to what that term meant. The Credit Union did not contend that it explicitly required Mr. Bagley to certify both reaffirmation agreements as a condition of its offer, but argued that such a condition was implicit. Not surprisingly, the Debtor denied that certification was a term of the Credit Union's offer.

An agreement to reaffirm a debt is made "between a holder of a claim and the debtor." 11 U.S.C. § 524(c). The debtor's attorney is not, properly speaking, a party to the agreement. It is therefore inaccurate to define reaffirmation as necessarily including the declaration described in § 524(c)(3). And since I do not believe, nor did the Credit Union allege, that "reaffirmation" is generally understood as including attorney certification, the question boils down to whether the Credit Union said or did anything which should have caused the Debtor to realize that the term carried special significance in this context. *See Heritage Broadcasting Co. v. Wilson Communications*, 170 Mich.App. 812, 818, 428 N.W.2d 784 (1988) ("A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.").

As noted previously, the proposed reaffirmation agreements were sent by the Credit Union to the Debtor's attorney, and included the language required by § 524(c)(3) with a place for Mr. Bagley to sign. But it is standard practice for creditors to incorporate a certification into their reaffirmation agreements, and there is nothing extraordinary about the fact that the Credit Union's offer was communicated through the Debtor's attorney. At best, these factors might reasonably be expected to have led the Debtor to infer that the Credit Union hoped for (or perhaps even anticipated) certification. However, neither the form of the reaffirmation agreements nor the manner in which they were presented warrant the conclusion that the Debtor should have known that certification was a prerequisite to valid acceptance of the offer.

The Credit Union argued that certification was an implicit term of its offer because the Debtor knew, or should have known, that there was no other way for the agreements to be rendered enforceable. It based this assertion on the following syllogism: a reaffirmation agreement cannot be made enforceable unless it is certified by the debtor's attorney pursuant to § 524(c)(3) or approved by the court pursuant to § 524(c)(6); Mr. Bagley's participation in the reaffirmation discussions took the agreements outside the scope of § 524(c)(6), which by its terms is limited to "case[s] concerning an individual who was not represented by an attorney during the course of negotiating [the reaffirmation] agreement"; therefore, only Mr. Bagley could validate the agreements. There are two fatal flaws in this theory.

The first is the Credit Union's assumption that the Debtor interpreted—or should have interpreted—§ 524(c)(6) in the same manner as the Credit Union. It is clear from Mr. Bagley's correspondence to the Credit Union that he did not believe that judicial approval pursuant to § 524(c)(6) was precluded under the circumstances, a position which he reprised at the hearing on the Credit Union's motion.

There is also no basis for concluding that the Debtor should have understood that an uncertified reaffirmation agreement cannot be approved by the court under § 524(c)(6) if it is "tainted" by legal representation. The Credit Union cited no case which so held, and I am not aware of any such authority. On the other hand, at least two courts assumed without discussion that judicial review under § 524(c)(6) is not limited in the way the Credit Union contended. *See In re Mitchell*, 85 B.R. 564, 565 n. 1 (Bankr.D.Nev.1988) ("Should the debtor wish to negotiate [a reaffirmation] agreement against the advice of counsel he may do so, however, the debtor must ... persuade the court ... that the agreement

satisfies the requirements of 11 U.S.C. § 524(c)(6)(A)."); *In re Reidenbach*, 59 B.R. 248, 250–51, 14 C.B.C.2d 573 (Bankr. N.D.Ohio 1986) (indicating that court approval of an uncertified reaffirmation agreement is required when the agreement is signed by the debtor against the advice of his attorney). Thus the Credit Union's novel interpretation of § 524(c)(6), even if sound, does not justify the conclusion that the Debtor should have known that only Mr. Bagley could make the agreements enforceable.

A more fundamental problem with the Credit Union's theory is its premise. The argument presupposes that it would be unthinkable for the Credit Union to allow the fate of the line-of-credit reaffirmation agreement to rest in the hands of Mr. Bagley. If it were unthinkable, then the Debtor's professed interpretation of the Credit Union's offer might be dismissed as unreasonable and self-serving. *Cf. Fisher v. Stolaruk Corp.*, 110 F.R.D. 74, 76 (E.D.Mich.1986) (allowing the defendant to rescind an accepted offer, based in part on the court's conclusion that "the size of the offer alone put plaintiff on notice of the [defendant's] mistake"). But that is not the case.

██ Assuming that certification were the only means by which the reaffirmation agreements could be rendered enforceable, then it would be entirely understandable, and perhaps expected, that the Credit Union's offer would specify that valid acceptance necessitated certification of both agreements. After all, the Credit Union's objective was to obtain two enforceable reaffirmation agreements, and such a condition would prevent Mr. Bagley from thwarting that objective by the simple expedient of certifying only the mobile home reaffirmation agreement. But a party who is outnegotiated cannot successfully petition the court to rewrite a contract to include terms that it "should have" included in the first place. *See Ginsberg v. Reliable Linen Service Co.*, 292 Mich. 70, 75–76, 290 N.W. 331 (1940) (employment contract stating that the plaintiff's salary would "not abate because of sickness or disability" would not be construed by the court as meaning *"brief* or *casual* sickness or disability"* (emphasis in original), even though such a limitation might be necessary to avoid "a hardship upon defendant," as "[a] contract cannot be made by construction because it later appears that a different agreement should have been consummated in the first instance"). Thus the standard for determining whether a term is implicit in an offer is not whether the offeror would have been wise to make the term explicit.

Instead, the appropriate standard is, as mentioned, whether the offeree should *know* under the circumstances that the term is a part of the offer. And even if, as the Credit Union postulated, only Mr. Bagley's certification could render the agreements enforceable, I do not believe that the Debtor should necessarily have inferred that certification was a condition for valid acceptance of the Credit Union's offer. A creditor's apparent willingness to trust the debtor's attorney to determine whether to sign the § 524(c)(3) declaration, and thereby render a reaffirmation agreement enforceable, is not so startling as to justify the conclusion that a reasonable person would have realized that the offer was, so to speak, too good to be true. Thus even if, contrary to the facts here, both parties were operating under the assumption that only Mr. Bagley's certification could render the reaffirmation agreements enforceable, I see no basis for holding that the Debtor could not validly accept the Credit Union's offer absent certification of both agreements.[26]

---

**26.** Although not argued by the Credit Union, its letter advising the Debtor that his account funds would remain "unavailable unless you reaffirm your loan *and the reaffirmation becomes valid,"* Exhibit 2 (emphasis added), might have caused the Debtor to suspect that the Credit Union's offer contemplated something more than the Debtor's signature on the reaffirmation agreements. But the offer and the letter were not contemporaneous: the letter was dated May 22, and the Credit Union's offer was made no earlier than May 30. And since the offer did not reiterate the condition regarding validation of the agreements, the Debtor could reasonably have inferred from that omission that he need only reaffirm the debts to accept the offer.

I therefore conclude that the mobile home reaffirmation agreement was binding on the Credit Union despite Mr. Bagley's refusal to certify the line-of-credit reaffirmation agreement. That being the case, the Credit Union had no contractual grounds for repossessing the mobile home, as its right to enforce the bankruptcy clause was waived by the reaffirmation agreement.[27] However, I do not believe that the Credit Union's contention regarding the validity of the mobile home agreement was frivolous. There being no other basis for concluding that it was somehow "unfair" for the Credit Union to threaten repossession, I hold that by making such a statement after execution of the reaffirmation agreement and before the filing of the motion for relief from the stay, the Credit Union did not violate § 362(a)(6).

C. Failing to Stop Payroll Deductions and Requiring the Debtor to Take Affirmative Action to Discontinue Prepetition Payment Terms

█ The Debtor claimed that the Cancellation of Payroll Deduction dated June 26, 1991, was actually the second such form that he completed. According to the Debtor, the Credit Union failed to stop the deductions pursuant to a cancellation form that he signed on or about May 15, 1991. But the Debtor offered no evidence to substantiate this assertion. His theory was therefore not proven.

As noted, one of the Credit Union's letters told the Debtor that "[i]f you do not terminate the [automatic] payroll deductions, the Credit Union will assume that you intend to continue with the payroll deductions on the same terms as were in effect on the day before the bankruptcy petition was filed." Exhibit 2. The Debtor was justified in believing that the allusion in the letter to continuing in accordance with the "same terms" as existed prepetition meant that the Credit Union would continue to apply the funds received by it pursuant to the automatic deduction to the outstanding balances on both the secured and unsecured loans.

In defense of the Credit Union's policy, it can be argued that a debtor who fails to respond to a creditor's invitation to terminate automatic loan payments on a prepetition debt has established a willingness to repay such a debt. Because these postpetition payments are (by negative inference) voluntary in nature, the argument goes, they are expressly permitted by § 524(f), and the creditor is therefore not in violation of § 362(a).

Arguments to that effect have been consistently rejected by the courts. *See In re Hellums*, 772 F.2d 379, 381–82 (7th Cir. 1985) (collecting cases) (holding that creditors cannot allow postpetition funds to be automatically applied to a prepetition indebtedness absent "some positive indication that debtors indeed intend to voluntarily assume their pre-petition debts"). But since *Hellums* ruled that a creditor who allowed automatic payments to continue postpetition violated § 362(a)(6), *id.* at 381, it is not directly relevant to the question of whether the Credit Union's action was patently illegal, and therefore unfair. After all, the point of my inquiry into the legality of the Credit Union's action is to determine if it constituted a violation of § 362(a)(6). So to avoid engaging in a tautological exercise, that inquiry must focus on whether the action was illegal for reasons other than § 362(a)(6).[28]

---

Thus I do not believe that the letter offers significant support for either party regarding the terms of the Credit Union's offer.

**27.** In a supplemental post-hearing brief, the Debtor argued that the Credit Union could not have invoked the bankruptcy clause even if he did not validly reaffirm the mobile home debt. *Compare Bell*, 700 F.2d at 1058 (stating that such clauses are enforceable postdischarge) *with In re Bryant*, 43 B.R. 189 (Bankr.E.D.Mich. 1984) (characterizing *Bell*'s statement as *dictum*, *id.* at 193, and "urg[ing]" the Sixth Circuit to

reconsider its position," *id.* at 196). I need not address that issue here, since I have held that the clause was rendered unenforceable by virtue of the parties' reaffirmation agreement.

**28.** If the Supreme Court or Sixth Circuit had held that such action violates § 362(a)(6), I would of course apply that holding to this case. But that result would follow from the principle of *stare decisis*, not from application of the two-pronged analysis that I have developed under § 362(a)(6).

Some courts have held that a creditor who allows automatic loan payments to continue postpetition absent express authorization by the debtor violates § 362(a)(3). *See, e.g., In re Shepherd,* 12 B.R. 151, 153, 7 B.C.D. 956, 4 C.B.C.2d 1479 (E.D.Pa. 1981). But subsection (a)(3) is not applicable here because it pertains only ·to estate property, and a chapter 7 debtor's postpetition earnings do not constitute property of the estate. 11 U.S.C. § 541(a)(6). *See, e.g., In re Gorski,* 85 B.R. 155, 156 (Bankr. M.D.Fla.1988).

Because the Credit Union's action was taken before the Debtor received his discharge, cases holding that such conduct violates the discharge injunction imposed by § 524, *see, e.g., In re Holland,* 21 B.R. 681, 688, 9 B.C.D. 385, 6 C.B.C.2d 1307 (Bankr.N.D.Ind.1982), are also inapplicable.

I have not uncovered any case, other than those citing §§ 362(a)(3) and (6) or § 524, which held that a creditor acted illegally by indicating it would apply the debtor's postpetition earnings to a prepetition indebtedness until otherwise instructed by the debtor. More to the point, I cannot dismiss as frivolous the implied-consent argument which can be fashioned in support of the Credit Union's position. I therefore do not believe that the Credit Union's action was unfair as representing the assertion of a right which it clearly had no right to assert.

But that does not end the inquiry. Under the standard which I have developed, a creditor's action may be perfectly legal (or, as in this case, arguably legal) and yet violate § 362(a)(6) for reasons strictly related to societal norms. And I believe that the Credit Union's tactic fits within this category: The "no-response-means-okay" ploy is an unsavory sales trick, the general disdain for which is evidenced by statutes which invalidate "commitments" obtained in that manner.[29] I therefore hold that the Credit Union's conduct was unfair for purposes of § 362(a)(6).

I also believe that the Credit Union's requirement of an affirmative act by the Debtor to discontinue automatic loan payments could be expected to influence the Debtor's decision regarding reaffirmation of the unsecured debt. A likely objective— if not the only one—in adopting this sort of approach is to maximize the amount recovered on a prepetition debt simply by virtue of the debtor's inertia. *See Hellums,* 772 F.2d at 381 (referring to "[a]n automatic wage assignment that lulls an unthinking debtor into paying-off [sic] a dischargeable debt").

Even had the Debtor promptly complied with the Credit Union's terms for discontinuing the automatic payments, hundreds of dollars in postpetition wages may have been applied to his unsecured loan. Thus the balance of the unsecured loan that the Debtor would have had to reaffirm, as a condition for reaffirming his mobile home indebtedness, would be reduced to that extent, making the Credit Union's demand that both debts be reaffirmed that much more appealing (or, perhaps, less revolting). The Debtor might also have been inclined to look at the postpetition wages applied to the loan(s) as money which would go for naught unless he reaffirmed both loans. Either way, the Credit Union's strategy could reasonably be expected to influence the Debtor's decision regarding reaffirmation of the unsecured indebtedness. I therefore conclude that the Credit Union violated § 362(a)(6) by communicating a message to the Debtor that he had to take the initiative to terminate the automatic loan payments.[30]

---

**29.** *See, e.g.,* Mich.Comp.Laws § 445.131 ("No person ... shall offer for sale goods where the offer includes the voluntary and unsolicited sending of goods ... not actually ordered or requested by the recipient, either orally or in writing. The receipt of any such unsolicited goods shall be deemed for all purposes an unconditional gift to the recipient.").

**30.** To the extent the Debtor objected to the Credit Union's contention that it could not terminate the automatic payroll deposits absent the Debtor's authorization, his argument is without merit. It appears that these arrangements typically require written notice from the payee in order to terminate the deposits. *See, e.g., Hellums,* 772 F.2d at 380; *Holland,* 21 B.R. at 684. And even if the Credit Union could have unilaterally terminated the payroll deposits (which the Debtor never established), its failure (or refusal) to do so would have at most amounted to only a

### D. Termination of Member Services

■ As previously explained, the Credit Union's termination of the Debtor's membership services did not violate § 525(b). The Debtor did not allege that that action was illegal for any other reason. Thus while the Credit Union's action could be expected to have an appreciable impact on a reasonable person's decision regarding repayment of the unsecured loan, the Debtor failed to establish that the action was contrary to law.

Nor do I find anything inherently unfair about revoking the Debtor's membership privileges. To the contrary, I believe most people—and certainly most other members of the Credit Union—would regard such a sanction as both reasonable and as a kind of poetic justice: after all, the Debtor's failure to repay his debts increases the cost of the Credit Union's services to other members.

Because there was nothing unfair about terminating the Debtor's membership privileges under these circumstances, I hold that such action did not violate § 362(a)(6). *See Brown,* 851 F.2d at 85 ("Nothing in the bankruptcy code requires this [credit union] to do business with this debtor."); *Henry,* 129 B.R. at 77 n. 3 ("[N]o serious argument has been made that the credit union should be required to make loans to the debtors.").[31]

### E. Requiring Reaffirmation of Both the Secured and Unsecured Loans

■ By requiring the Debtor to reaffirm his unsecured loan as a condition for acceding to reaffirmation of the secured loan, the Credit Union took an approach analogous to a creditor who refuses to allow reaffirmation of only the secured portion of a single, undersecured debt. Because a debtor does not have the right to compel a creditor to accept "partial" reaffirmation of an undersecured indebtedness, *see, e.g., In re James,* 120 B.R. 582, 586 (Bankr.W.D.Okla.1990), there would be nothing improper about that creditor stating up front that the debt could not be selectively reaffirmed. The fact that the Credit Union's policy encompassed two separate loans, instead of just one, does not call for a different conclusion. *But see In re Green,* 15 B.R. 75, 78, 8 B.C.D. 770, 5 C.B.C.2d 733 (Bankr.S.D.Ohio 1981) (holding that a creditor violated § 362(a) by making repayment or reaffirmation of an unsecured loan a condition for permitting the debtor to reaffirm a secured loan, but offering no rationale to support the conclusion).

While the Code emphasizes that a reaffirmation agreement must be "voluntary" on the debtor's part, *see* §§ 524(c) and (d), it is also clear that a creditor need not consent to such an agreement unless the terms are acceptable to it. *See In re Bell,* 700 F.2d 1053, 1056 (6th Cir.1983) ("[Section] 524(c) facially contemplates that the creditor, *for whatever reason,* may reject any and all tendered reaffirmation offers...." (emphasis added)). Thus while linking the two loans in this fashion would likely influence a reasonable person's decision regarding repayment of the line-of-credit indebtedness, I see nothing unfair about it, and I accordingly hold that the Credit Union's policy did not violate § 362(a)(6).

---

trivial annoyance to the Debtor; he would have had to withdraw the deposited funds from the Credit Union instead of receiving them directly in the form of his paycheck. The Credit Union acted improperly by indicating that it would apply the funds received via the payroll deposit to the prepetition debts, not by allowing the direct deposits to continue. *Cf. Holland,* 21 B.R. at 687 ("[W]e do not hold that the Credit Union violated the stay by receiving money pursuant to the arrangement in this case and depositing it into the debtor's account.... However, when the credit union transfers the money to pay a pre-petition debt owed to itself it has then committed an act to collect a claim and thereby

violates the stay unless ... there is clear evidence that, post-petition, the debtor demonstrated willingness to voluntarily have those earnings applied to the debt.").

**31.** The Debtor cited *In re Patterson,* 125 B.R. 40, 50–51, 24 C.B.C.2d 1671 (Bankr.N.D.Ala.1990), and *Guinn,* 102 B.R. at 841–43, for the proposition that the Credit Union violated the automatic stay by terminating his membership privileges. But these cases do not clearly support the proposition and, to the extent that they do, I find them unpersuasive.

## F. Refusal of the Credit Union to File the Reaffirmation Agreements

Section 524(c)(3) specifies that a reaffirmation agreement is enforceable only if it "has been filed with the court." By refusing to file the original mobile home reaffirmation agreement (or return the original to the Debtor so that he could file it[32]), the Credit Union obligated the Debtor to file a photocopy of the agreement. Although a duplicate document is generally, and in this case was, accepted in lieu of the original, the Credit Union's tack did create an obstacle for the Debtor that I believe was more than negligible.[33] Indeed, a reasonable person might not even be aware that a photocopy of the reaffirmation agreement could under any circumstances be acceptable for filing with the court. I therefore conclude that the Credit Union's refusal to file the original reaffirmation agreement or to return it to the Debtor could reasonably be expected to have a significant impact on the Debtor's decision regarding repayment of the unsecured loan.[34]

Turning to the question of fairness, I believe that the Credit Union was out of line in refusing to relinquish control of the original mobile home reaffirmation agreement. As discussed, the Credit Union was of the opinion that the agreement was unenforceable because there was no meeting of the minds with respect to it. That being the case, the "honorable" way for the Credit Union to have proceeded was to allow the Debtor to file the agreement and then litigate the issue. Instead, the Credit Union chose a ploy that was apparently designed to render the agreement unenforceable for a technical reason unrelated to the merits of its position—namely, the lack of a filed agreement.

Thus the Credit Union in effect issued this ultimatum to the Debtor: "If you don't get your attorney to certify the unsecured reaffirmation agreement, then we will do everything in our power to prevent you from filing the fully executed mobile home reaffirmation agreement." By essentially holding the original reaffirmation agreement hostage—with certification as the ransom—the Credit Union engaged in exactly the kind of "nasty" behavior which fits within the pejorative sense of the term "coercion." I therefore hold that the Credit Union violated § 362(a)(6) by refusing to file, or to permit the Debtor to file, the original mobile home reaffirmation agreement.

## G. Credit Union's Overall Conduct

The Debtor argued that even if none of the questioned acts independently violated § 362(a)(6), together they did. This assertion must be analyzed carefully. If certain options are available to a creditor as a means of obtaining reaffirmation of a debt, and each option is "fair" for purposes of § 362(a)(6), I do not believe it would ever be "unfair" for the creditor to utilize all of them. I reject the notion that "two rights make a wrong" in such circumstances. I therefore will not review the Credit Union's actions for purposes of determining whether any of the actions, although fair in isolation, is unfair given the "totality of the circumstances."

On the other hand, it is not difficult to see how several different actions taken by a creditor, each of which has only a trivial impact on a debtor's decision regarding reaffirmation, could in combination create an appreciable impact on that decision. Thus even if an act is not sufficiently coer-

---

32. The Debtor did not claim that the Credit Union refused to give the original mobile home agreement back to him, nor does it appear that the Debtor even asked for its return. Under the circumstances, however, it is clear that such a request would have been futile. Indeed, the Credit Union declined the Court's invitation, during the hearing on its relief from stay motion, to return the agreement to the Debtor so that he could file it.

33. The Debtor's burden would have been magnified considerably had he not retained a duplicate of the agreement—a daunting possibility with respect to which the Credit Union appears to have been utterly indifferent.

34. As with the Credit Union's advice regarding repossession, the "concession" which the Credit Union stood to gain by this action was certification of a reaffirmation agreement that had already been executed. *See supra* n. 25.

cive on its own, it may be if considered in conjunction with other actions taken by the creditor.

Here, of course, I have already held that two of the Credit Union's acts—implying that the Debtor was required to affirmatively terminate automatic payments on his prepetition loans and refusing to permit the filing of the original mobile home reaffirmation agreement—were coercive for purposes of § 362(a)(6). Even if these acts independently do not reach the "coercion threshold," the threshold for each of those acts was clearly surpassed when coupled with the other actions taken by the Credit Union. And since the Credit Union acted unfairly in taking the two described actions, each constituted a violation of § 362(a)(6).

### IV. Injunctive Relief

██ A request for an injunction must be made in an adversary proceeding. F.R.Bankr.P. 7001(7). Thus it was inappropriate for the Debtor to seek that relief in a contested matter such as this. However, when the parties try an issue without objection on procedural grounds, courts generally disregard the irregularity. *See, e.g., Thurston v. United States*, 810 F.2d 438, 443–44 (4th Cir.1987) (holding that the plaintiff waived an objection to the defendant's failure to plead qualified immunity as an affirmative defense); *Turchio v. Den Norske Africa*, 509 F.2d 101, 105 (2d Cir. 1974) ("[T]he manner by which the questions are submitted to the jury remains merely a matter of form rather than of substance, which, like other procedural matters may be waived by failure to make timely objection."). I have treated it as a judgment call whether or not to address matters governed by F.R.Bankr.P. 7001 other than in the context of an adversary proceeding. *Compare In re Moon*, 116 B.R. 75, 76 n. 1 (Bankr.E.D.Mich.1990) (Rule 7001(6)) *with In re Sanglier*, 124 B.R. 511, 512 n. 2 (Bankr.E.D.Mich.1991) (Rule 7001(2)). In this case, I conclude that the injunction request should be addressed, primarily because so much effort has been expended by the parties and the Court. It would be unfair and a waste of resources to let that effort go for naught.[35]

Because the Credit Union did not act improperly in terminating the Debtor's membership privileges, I will not order it to restore those privileges.

For what it's worth, the majority view appears to be that, even if it did not already do so prior to the date the Debtor received his discharge, the Credit Union can now offset the debt(s) owed to it by the Debtor to the extent of $5.00. *See In re Buckenmaier*, 127 B.R. 233, 237, 21 B.C.D. 1276 (9th Cir. BAP 1991) ("Most cases hold that a valid setoff claim cannot be defeated by a discharge in bankruptcy."). Since the Debtor did not articulate any theory supporting a contrary position, I will deny his request for an injunction barring the setoff.

Having held that the Credit Union contracted away its claimed right to repossess the Debtor's mobile home without a fresh default, I would be surprised if it nonetheless attempted to do so. Still, the Debtor asked for an injunction and proved his entitlement thereto. I will therefore enjoin the Credit Union from repossessing the mobile home based on the fact that the Debtor filed bankruptcy.

### V. Damages

Although the Debtor's motion alleged that the Credit Union was in "contempt," § 362(h) is, under these circumstances, the more appropriate reference for determining what sanctions should be imposed on the Credit Union for violating the automatic stay. *See In re Price*, 103 B.R. 989, 991–92 (Bankr.N.D.Ill.1989), *aff'd*, 130 B.R. 259 (N.D.Ill.1991). Pursuant to that subsec-

---

**35.** The substantial investment of judicial time and resources necessitated by the Debtor's motion demonstrates why the courts should be vigilant in enforcing F.R.Bankr.P. 7001. Determinations regarding the appropriate number of judicial officers and support personnel in the bankruptcy courts are based in significant part on the number of adversary proceedings filed and pending in each district. To the extent parties are permitted to circumvent Rule 7001, those figures are underreported.

tion, "[a]n individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

■ A "willful" stay violation occurs if the offensive action was intentional and taken at a time when the actor was aware of the automatic stay. *See Atlantic Business and Community Corp.*, 901 F.2d at 329; *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989). It is obvious that the Credit Union's actions—refusing to relinquish control of the original mobile home reaffirmation agreement and implying that the Debtor must take affirmative action to stop automatic loan payments—were intentional. Nor can there be any doubt that the Credit Union was aware of the pending stay. The Credit Union therefore acted willfully in violating § 362(a)(6).

■ The Debtor asked that he be awarded "a significant sum as monetary damages" in compensation for the "anguish" he suffered because of the Credit Union's misconduct. P. 7 of Debtor's Brief in Support of Motion for Contempt. The Debtor is entitled to damages for mental anguish "to the extent that actual injury has been proved." *Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1104 (6th Cir. 1989). However, the only evidence submitted at the hearing in support of his contention that he experienced any kind of trauma as a result of the Credit Union's actions was the Debtor's own vague and conclusory testimony to that effect. Because the Debtor "failed to provide specific and definite evidence of his own mental anguish, anxiety or distress," *Wiskotoni v. Michigan National Bank–West*, 716 F.2d 378, 389 (6th Cir.1983), that allegation was unproven, and his request for damages based on mental anguish will accordingly be denied.

■ The Debtor also asked for reasonable attorney fees. The Credit Union opposed that request, noting that the Debtor obtained legal representation pursuant to a legal services plan that was paid in advance as an employee benefit.

The collateral source rule provides that "benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." 22 Am.Jur.2d, Damages § 566 (1991). With exceptions not relevant here, this rule applies to actions sounding in tort which, as in this case, are governed by federal substantive law. *Hartnett v. Reiss Steamship Co.*, 421 F.2d 1011, 1016 n. 3 (2d Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970) ("The general rule in the federal courts is that the collateral source rule is applied....").

Applying the rule to these facts, it is clear that the Credit Union cannot escape liability for attorney fees based on the fact that its stay violation did not result in a loss to the Debtor for such fees. The Debtor was spared additional, out-of-pocket legal expenses only by virtue of the fact that he obtained legal insurance through his employer—insurance which was in essence purchased by the Debtor. *See Patterson v. Norfolk & Western Ry.*, 489 F.2d 303, 308 (6th Cir.1973) ("[T]he [hospitalization insurance] policy may best be classified as a fringe benefit given in part consideration for the appellee's services as an employee.... The trial court, therefore, was not in error in refusing to admit evidence pertaining to it."); John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 Calif.L.Rev. 56, 58 (1983) (" 'Fringe benefits' under employment contracts ... are generally treated no differently [for purposes of the collateral source rule] than if the plaintiff had paid for them independently and on his own initiative; functionally, these benefits are clearly part of the remuneration for his work.").

Denying the Debtor his right to reasonable attorney fees would in effect permit the Credit Union to receive a benefit—"no-charge" legal services—that was intended for the Debtor and to which the Credit Union had neither a contractual or equitable right. Because that is exactly the sort of injustice the collateral source rule is

designed to prevent,[36] I hold that the Debtor is entitled to attorney fees pursuant to § 362(h) notwithstanding the fact that his legal representation in this matter was provided pursuant to a prepaid legal services plan.[37] Accordingly, I will award the Debtor $500 in attorney fees, an amount I deem to be reasonable in light of the time needed to conduct legal research, draft the appropriate pleadings, and represent the Debtor at the hearing on his contempt motion ($100/hr. × 5 hrs.).[38]

Finally, the Debtor requested punitive damages. Such damages are warranted under § 362(h) if the stay violation involves "egregious, intentional misconduct on the violator's part." *In re Ketelsen,* 880 F.2d 990, 993 (8th Cir.1989). By implying that the Debtor was obligated to take affirmative action to terminate loan payments made by the Credit Union from his automatic payroll deposits, the Credit Union resorted to a rather devious gimmick. I do not believe, however, that its action was so reprehensible as to justify punitive damages.

Although a closer call, I reach the same conclusion with regard to the Credit Union's refusal to allow the Debtor to file the original mobile home reaffirmation agreement. In essence, the refusal amounted to an attempt to deny the Debtor his day in court: the Credit Union's ploy would have been less subtle, but no more mean-spirited, if it had threatened to shred the original agreement unless its demands were met. However, the Credit Union's refusal

to relinquish the agreement only became explicit in open court, and was then subject to judicial control. Thus any prejudice could be, and was, substantially dissipated. Accordingly, I conclude that on the unusual facts of this case, the conduct does not warrant punitive damages.

## VI.  Summary

The Credit Union violated the automatic stay by refusing to permit the Debtor to file the original mobile home reaffirmation agreement and by implying that the Debtor had to affirmatively terminate the automatic payroll deductions in order to stop the Credit Union from applying those funds to the Debtor's prepetition loans. Since the mobile home reaffirmation agreement is enforceable, the Credit Union will be enjoined from repossessing the mobile home based on the Debtor's violation of the bankruptcy clause. The Debtor is also entitled to attorney's fees in the amount of $500.00. An appropriate order shall enter.

---

36. *See Siverson v. United States,* 710 F.2d 557, 560 (9th Cir.1983) ("The government's rationale ... ignores the collateral source doctrine's purpose of preventing a windfall to the defendant.").

37. It bears emphasizing that § 362(h) only authorizes the recovery of attorney fees by the party injured as a result of the stay violation. *Cf. Phillips v. General Servs. Admin.,* 924 F.2d 1577, 1582 (Fed.Cir.1991) ("[A]ny fee award [pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412] is made to the 'prevailing party,' not the attorney. Thus, Phillips' attorney could not directly claim or be entitled to the award. It had to be requested on behalf of the party."). Since it is the Debtor, rather than the legal services plan, who is the direct beneficiary of any fees awarded pursuant to that subsection, I

need not address the ethical problems posed by a request for attorney fees made on behalf of a lay organization employing the prevailing party's attorney. *See, e.g., Harper v. Better Business Servs.,* 768 F.Supp. 817, 820–22 (N.D.Ga.1991).

38. This figure is based on what I consider to be a typical hourly rate for consumer bankruptcy attorneys in this area. *Cf. Brown v. Eichler,* 680 F.Supp. 138, 143 (D.Del.1988) ("[C]ounsel should receive fees [pursuant to the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988] at the prevailing market rates even though they work out of a prepaid legal services plan."). It represents an approximation of the fees that the Debtor would have incurred as a result of the Credit Union's stay violation, but for the fact that his legal services were paid in advance.